[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Nature and History of Proceedings
Michael B. was prematurely born on March 9, 1992. Approximately six weeks later Linda Carosella, a pediatric nurse practitioner from Mt. Sinai Hospital filed an affidavit in this Court which indicated the following information. Michael's first clinic visit took place on March 26, 1992; he was fifteen days old and was the fifth child born to the 22-year old mother Carol B. The other children were five years of age, fours of age, two years of age and nine months of age. Carol B. admitted that she had kept only two prenatal clinic appointments which she usually missed because she was "high" and that she used daily approximately 30 to 40 dollars worth of cocaine during her pregnancy.
Michael was precipitously born at 34 weeks gestation. His birth weight was four pounds nine ounces. He had positive toxicology for cocaine. He remained in the Special Care Nursery at Mr. Sinai Hospital for nine days before being discharged home to his mother. The family was well known to the Department of Children and Youth Services (DCYS). Carol indicated to Nurse Carosella that the children's father Nelson M. was physically abusive to her and was also an IV drug user. She further reported that Nelson M. was in jail for sexually molesting an eight-year old girl.
At the time of the child's two-week physical examination Michael had gained only five ounces. His weight was in the fifth percentile (5%). He had an oral thrush infection.
During the course of the next two weeks mother failed to CT Page 5818-C follow-up on clinical visits which had been scheduled. On April 7, a visiting nurse reported that during a home visit she had observed hypertonic movements of Michael's trunk and upper extremities including jitteriness and clenched fist with Michael at rest. Notwithstanding the adamant insistence by the VNA nurse, Carol B. continually missed subsequent follow-up appointments at the clinic. On April 20, 1992, Irene Kotiadis, a social worker for the Department visited the home. At that time Carol B. was non-communicative as she giggled and rocked back and forth and appeared to be under the influence of drugs. The child, Michael B. appeared "tiny, jittery and blue in color". Mother admitted that the child had not been fed yet that day. The Department obtained a 96-hour hold on the child and brought the child to the hospital where the child was first fed at 3:00 p. m. in the afternoon. The child was soiled and smelled badly. That the was the last day that Michael B. saw his mother or four siblings. Mother has not visited with the child nor expressed an interest in doing so. On April 23, 1992, Michael was placed in an approved foster home where the child remains to date.
II. Findings Re: Mother
Carol B. was born in Norwich, Connecticut on October 29, 1969. She completed the eighth grade and dropped out of school after meeting Nelson M. She soon thereafter began a common-law relationship with him. She gave birth to his first child at age 17 and by age 22 had given birth to five children. Carol has a long-standing history of substance abuse and criminal activity including arrests for interfering with police, threatening, disorderly conduct, prostitution, risk of injury to minor children and other arrests. Carol has been completely avoidant of all attempts by the Department of Children and Families to assist her with her drug abuse problems. She has been referred to Project Recovery for drug treatment on July 10, 1992 and October 24, 1992 but refused to attend. During the time that Michael has been in placement Carol has shown no interest and made no effort to see her child in order to develop a relationship with him. She has no on-going relationship with this child. Carol B. has most recently been known to be residing with an aunt in Camden, New Jersey. She did not appear for the termination hearings.
Findings re: Father. Nelson M., the putative father of this child was born on September 26, 1956 in Puerto Rico. CT Page 5818-D Carol B. has reported that Nelson M. is a substance abuser and on one occasion an older child stated that she saw Nelson M. "shooting dope through his veins" Nelson M. has a prodigious arrest record dating back to 1975. Of the 29 arrests (State's Exhibit E) most were in the nature of robbery, burglary, larceny, assault, criminal mischief, criminal trespass and sexual assault. His last arrest occurred on August 18, 1991 on a charge of sexual assault in the first degree. Nelson M. became incarcerated prior to the birth of this child (March 9, 1992). Nelson remains incarcerated to this date. He has seen his child on only two occasions when the child was brought to the correctional facility by Irene Kotaidis of the Department of Children and Families. No evidence was presented in Court to show that Nelson M. made any effort to send his child birthday cards, Christmas cards, gifts or anything of that nature. Nelson M. did write to court to express an interest in having his then girlfriend be considered for placement of the child. That will be discussed in further detail later.
It should be noted, however, that Nelson M. maintains that his parental rights should not be terminated. He attended all four days of hearings on the Commissioner's Petition for Termination of Parental Rights, having been brought to Court by writ of habeas corpus.
The Department brought the child to the correctional center for two visits. On the first visit Nelson was able to hold the child for a very short period of time and on the second visit he was unable to hold the child since he could only see the child through glass. There was no interaction between the child and the father and the child at the time of the visits was a pre-verbal infant. Nelson admits that he has been "an irresponsible parent in the past and I admit that." He indicates that he is to be released in 1995 but could receive a release as early as November of 1994. His attorney, in argument, admits that even if Nelson were released in November of 1994 any possible reunification would take at least six months following his release from prison. That is more than one year from the date of trial. Mr. Marcano indicated that if got custody "I would get a baby sitter to take care of the child."
Nelson M. was evaluated by psychologist, Robert D. Meier at the request of the Court. Dr. Meier indicates, in part: CT Page 5818-E
 "Mr. M. stated that he is willing to take responsibility for his child, and has begun to address his substance abuse problems. However, such individuals often make such commitments when ordered or when incarcerated. Given his lack of responsibility, his long history of criminal behavior, his admittedly long-term alcohol problems, his having failed to take responsibility for his other children, and his failure to keep in contact with his son, the prognosis for any significant change is judged to be poor."
Through his attorney, Nelson M. believes that the reason his parental rights are being terminated is solely because he is incarcerated and has been prevented from establishing a relationship with his child.
The Department of Children and Families takes the position that Mr. M has not been denied a relationship with his child but rather father has indicated he does not want to see the child any more while he is incarcerated. Irene Kotaidis, the social worker, indicated that in addition to the two visits that father has had with the child, on two other occasions she went to the prison to have administrative reviews of the situation with Mr. M at the correctional institution. She indicates that Mr. M said that he did not wish to have any further visits at the prison in that he expected to be released in the not too distant future.
Anslem Elumogl, a correctional counselor at Enfield indicated that he had been Nelson's counselor since September of 1992, that Mr. Elumogl did not know that any child of Nelson's was in foster care since Mr. M had never mentioned it. Neither had Mr. M ever asked any assistance to contact DCF or made any efforts to have gifts sent or telephone contact established with this child. Mr. Elumogl further testified that in April of 1993 Nelson M received a Class A ticket for having contraband in his cell and lost sixty days of "good time" which reduced his chances for an earlier release.
Further testimony and exhibits indicated by way of a visitor's list that Nelson M. was eligible to receive visitor's at the correctional center. THe principal visitor CT Page 5818-F for Nelson was one Wanda Vega, a deputy sheriff assigned to the Hartford Juvenile Court. The record reflects (State's Exhibit C) that Ms. Vega visited approximately once a week for an entire year. Nelson admits that no efforts were made to have Wanda Vega bring the child to the correctional center for visitation.
Nelson also argues that he did send letters to try to obtain visitation. He indicated that he did not trust the Department of Children and Families and accordingly sent the letters directly to the Court. The only letter introduced into evidence which was directed to the Court was a letter of January 7, 1993 in which Mr. M expressed an interest in having his "fiancee" Rosa G. be considered as a foster home placement for the child. The letter did not in any way seek visitation for himself. The visitor's list submitted as an exhibit indicates that Rosa G. was listed as his "sister" The record further reflects that she was stricken as a visitor from the list on February 4, 1993. No visits occurred by Rosa Guzman after January 2, 1993.
The Department of Children and Family Social Worker indicates that they attempted to contact Rosa G. who by that time had no interest in either Nelson M. nor the child. Ms. Kotaidis testified that Ms. G. did not wish to be involved since she did not know "where her relation was going with Mr. M".
Mr. M admitted into evidence a mittimus which indicates that on September 25, 1992 he was convicted of violation of53a-60 (a)(1) for which he received a five-year unsuspended effective sentence. He was also convicted of a violation of53a-95 for which he received a separate second sentence of five years to run concurrent. 53a-60-(1) is assault in the second degree a Class D felony and 53a-95 is unlawful restraint in the First Degree a Class D felony. This document was offered to show that even though he had been arrested for a sexual assault, his conviction and present incarceration was "only for assault".
Mr. M represents that while he was in the state correctional facility he attended AA classes, NA classes and a GED course. He further offered into evidence a certificate that he had completed a basic course in non-violent conflict resolution. The Court finds that while Mr. M did attend CT Page 5818-G some courses in the correctional institution which may demonstrate an attempt to rehabilitate himself in the future, he neither established nor zealously pursued a relationship with this child or any other of his children. When asked why he didn't diligently pursue visitation he responded "Everything you do . . . takes a couple of weeks. I was counting on Irene (Kotiadis) to get in touch with me." If Mr. M had anything while incarcerated, he had time. Mr. M did not use that time effectively to visit this child or actively pursue the issue of visitation if that was anywhere on his agenda.
III. Adjudication
The court having heard testimony and received evidence April 25, 1994, May 31, 1994, June 7, 1994 and June 9, 1994 finds the following by clear and convincing evidence:
 (a) Both the mother and the father have abandoned Michael B. in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. As indicated earlier, mother physically abandoned the child. She has not expressed any interest or concern for this child in the two years that the child has been in placement. Father's abandonment has been more symbolic. This Court recognizes that incarceration alone is not sufficient to constitute abandonment. In RE: Juvenile Appeal, 2 Conn. App. 705 (1984); In RE: Juvenile Appeal 187 Conn. 431, 443 (1982) nor is incarceration alone a sufficient cause for determination of that parent's rights. In Re: Juvenile Appeal (84-6), supra. Citing Matter of Troy 27 Or. App. 185, 188-89, 555 P.2d 933 (1976). In this case the Court has earlier indicated that Nelson M. has failed to zealously make effort to establish a relationship with this child. His attempts, if any, to achieve contact with this child through telephone calls, sending of cards and CT Page 5818-H gifts and establishing visitation were either non-existent or extremely limited. This Court concludes that Nelson M. has failed to maintain or establish any reasonable degree of interest or concern or responsibility as to this child. In Re Kezia M., 33 Conn. Appellate 12, 17-18 (1993). In Re Luke G., 40 Conn. Sup. 316, 323.
 (b) Further the Court finds that Michael B. has been found in a prior proceeding on November 3, 1992 as having been a neglected and uncared for child. The Court finds that mother has failed to achieve such degree of personal rehabilitation as would encourage the believe that within a reasonable time considering the age and needs of the child that she could assume a responsible position in the life of this child.
 (c) With respect to the third possible ground for termination of parental rights this Court finds that there is no ongoing parent and child relationship with respect to either the mother or the father. This relationship is defined as a relationship that ordinarily develops as the result of the parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and to allow for the time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interest of the child. The Court has heard credible testimony that no parent-child relationship exists between either the mother or the father and the child. The issue of the father's incarceration is here not dispositive, since the issue is not related to fault.
It is reasonable to read the CT Page 5818-I language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced (citations omitted). In consideration whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance (citations omitted). The ultimate question is whether the child has no present memories or feelings for the natural parent. (citations omitted). In RE Kezia M., supra, page 21.
Based upon the testimony of the foster parent and the psychologist the Court concludes that there is no ongoing parent-child relationship between mother and child or father and child. This child apparently has no memories of either parent.
Having concluded that no ongoing parent-child relationship exists the Court must then determine what is in the best interest of the child. There are factors to be considered in deciding whether it would be in this child's best interest to permit further time for a relationship include the length of stay with the child's foster parents to the nature of his relationship with the foster parents, the degree of contact maintained with natural parent and the nature of the relationship to his natural parents. In RE Kezia M., supra 20.
The psychologist indicates that it does not appear to be in the best interest of the child to permit more time to establish a parent-child relationship. "Michael has been raised since shortly after the birth by the foster parents whom he views as the psychological parents. He has shown CT Page 5818-J positive growth during that period of time . . . it is generally recommended by professionals in child development that a child placed at such an early age, not remain in placement without permanency planning for more than one year, with two years being considered the maximum. This evaluator agrees with such time frames, and given the socialization and development a child experiences in the first two years, and the attachment to parent figures that develops, permitting additional time for a parent-child relationship to develop is not in Michael's best interest." This Court concludes based upon the psychological testimony which "rightly is accorded great weight in termination proceedings" In RE Nicolina T., 9 Conn. App. 598,605, and based upon a consideration of the genetic bond shared by the biological parents and the child, McGaffinv. Roberts, 193, Conn. 393 (1984) that termination of parental rights is appropriate and the grounds have been established.
The Court finds that with respect to both mother and father that the grounds have existed for more than one year.
IV. Statutory Considerations
In accordance with General Statutes Sec. 17a-112, the Court makes the following specific findings:
1. Services Offered
The Department of Children and Families initially made numerous efforts to provide services for mother to rehabilitate herself in order to allow a reunification with the child. The mother failed to avail herself of these efforts. Due to the incarceration of the father, services could not be provided to him.
2. Compliance With Federal Child Welfare Act
The Court finds that the Department of Children and Families made reasonable efforts given the situation and circumstances to reunite mother and child and to establish a relationship between father and child. The social studies made and filed in this matter indicate compliance with the Federal Child Welfare Act with respect to placement decisions.
3. Court Orders
The Department with the approval of Court set reasonable CT Page 5818-K and realistic expectations especially for mother but also for father. Carol B. missed all of her scheduled visits, administrative reviews and almost all court dates. She failed to appear for the termination hearings. The father has been incarcerated since the child's birth. He had two visits at the correctional center but declined further visits.
4. Significant Emotional Ties
This child has strong emotional ties only with the foster family which has provided him with his physical, medical, emotional and educational support. This child has, as earlier indicated, no emotional ties to either biological parent.
5. Age of the Child
This child is approximately two years old. The psychologist report indicates that despite his special needs he has thrived in this present environment. A plan for permanency would continue the consistency love and stability that he has experience which would clearly be in his best interest. A removal from this home would be devastating and create a serious psychological impact on the child if that occurred. The child is in a pre-adoptive setting. It is in the child's best interest to remain in this stable and caring environment where the child is attached and bonded.
6. Regarding Parents' Efforts to Conform Their Conduct to the Best Interest of the Child
Neither parent has made any realistic or sustained effort to conform their conduct to either minimally acceptable parental standards regarding Michael B. Mother has vanished from this child's life. Father has failed to actively and consistently pursue a relationship with this child.
7. Interference With Meaningful Relationship
The Department of Children and Families have worked actively toward reunification with mother until she precipitously left the state nearly two years ago. While the father contends that the Department did not offer sufficient visitation to him, the Court finds that the father failed to actively work to secure visitation and to establish a relationship with this child. He appears to have no relationship regarding visitation with any of his five CT Page 5818-L children. His principal interest appears from the record to involve active visitation with girlfriends rather than with children. While the Court concludes that the Department might have been more aggressive in establishing visitation with the father, his failure to pursue the visitation on his own behalf was equally unenthusiastic.
Based upon the foregoing findings the Court concludes that it is in the best interest of this child to terminate the parental rights of Carol B. and Nelson M.
V. ORDER
It is accordingly ordered that the parental rights of Carol B. and Nelson M. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent, a permanency plan shall be submitted within ninety days as required and a Motion to Review plan for terminated child shall be filed in accordance with federal and state law.
VI. APPEAL
The parents have twenty days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel is willing to continue representation, this court will appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book § 4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book § 4040. Such motions, if unopposed, will be granted exparte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the court clerk of the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353
CT Page 5818-M (1963); Fredericks v. Reincke.[,] 152 Conn. 501 (1964).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Foley, J.