[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) is petitioning to terminate the parental rights of the mother and father of Dalilah Rose born on January 6, 1994, a little girl who has been in foster care continuously since she was approximately one month old and who is now nearly three years of age. The biological mother of Dalilah is Stacie M. and the biological father is Angel C.
The petition is based on the statutory grounds set forth in General Statute § 17a-112, in that the parents have abandoned the child; that in a prior proceeding the child has been adjudicated neglected and the parents have failed to achieve personal rehabilitation; and lastly, that there is no ongoing parent-child relationship.
The procedural background of this case indicates that an Order of Temporary Custody was entered in favor of DCF on February 10, 1994. The child was adjudicated a neglected child on April 20, 1994, and the petition for termination of parental rights was filed on April 13, 1995. In addition to the statutory parties (that is: DCF, the mother, the father, and the child, who were each represented by separate counsel), the paternal grandmother was permitted to intervene and was represented, the maternal grandfather was permitted to intervene and was represented, and the foster parents were permitted to intervene and were represented. The trial occurred over seven days beginning on October 23, 1996 and the evidence concluded on November 1, 1996. Fourteen witnesses testified including three psychologists and one psychiatrist.
FACTUAL FINDINGS
At the time of Dalilah's birth, Stacie M., the child's biological mother, had a serious history of drug and heavy alcohol abuse. Dalilah was born prematurely with a respiratory problem. On the day following her birth, the DCF social worker, Linda Ventrelli, became involved in the case and provided thorough and appropriate intervention and case management. Ms. Ventrelli obtained shelter and supportive services for the mother and child immediately following their release from the hospital. During that period, Dalilah and her mother moved seven times. CT Page 6821 Various observers indicated that Stacie would swear at the baby, shake the baby, not wake up at night to feed the baby, and was inappropriate and impatient with the child. Stacie was unable to provide the necessary physical and emotional care required for this child.
Stacie herself had been in placement with the Department of Children and Youth Services as a child from 1988 to 1992. During that period, Stacie had seven placements, including the Cromwell Children's Home, Lake Grove, Vitam, Norwalk Hospital, several shelters and a foster home. Stacie was, during her placements, physically assaultive on several occasions and had numerous emotional and behavioral problems.
Dalilah's biological father, Angel C., was incarcerated at the time of the child's birth and incarcerated at the time of the trial of this case. His participation in the child's life will be discussed later.
The biological father, the maternal grandfather and the foster parents attended each day of trial. The child's biological mother, Stacie, came to court late the first day, and accordingly the court delayed commencing the trial until she arrived. On the second day of trial Stacie called to indicate that her car broke down and the court waited until 12 noon for her arrival. The court recessed until 2:00 p. m. The court was mindful of the holding of In re Jonathan P., 23 Conn. App. 207, 211-12 (1990), which requires the presence of legally necessary parties. Since mother had failed to appear at 2:00 p. m., the court suspended the trial until the following day. On October 25th, Stacie arrived at 10:25 a.m. and she arrived back to court late after the lunch recess. At 4:35 p. m. that day, Stacie's attorney requested the court to recess or adjourn early at his client's request. The court, speaking directly to Stacie, indicated to her the need to be in court on time each day and that in the future the court would start in her absence if she failed to appear promptly at 10:00 a.m. Stacie promised to be in court the next morning punctually at 10:00 a.m. Notwithstanding her promise to appear, Stacie did not return for the remaining days of the trial.
Dalilah Rose is the offspring of a single male and a single female who had a casual acquaintance and sexual relations in 1993 while Stacie was living in a shelter and Angel was living in Hartford, awaiting sentencing for a second degree assault conviction. Angel was notified of Dalilah's birth while he was at CT Page 6822 the Garner Correctional Facility. Angel questioned paternity because "me and Stacie weren't that close. I heard she was living with someone else." He indicated in his testimony that he didn't want to start visiting the child until he was sure he was the father. When asked why not, he said, "maybe `cause of the embarrassment or maybe finding out later that it ain't mine." Accordingly, he did not seek visitation with the child but did dispute paternity.
Stacie was born on September 9, 1974 and comes from a tragic and sad familial background. In reports to the social worker at DCF and to the various evaluators, Stacie usually gave the following history. The history is occasionally inconsistent but appears to be globally reliable. She believes she was born with fetal alcohol syndrome. She reports that both her mother and father drank alcohol to excess and that they both used drugs. She reports that it is difficult to discuss her early experience with her father because she hates him so. She reports that her mother left the home when she was two years old and that she never saw her mother subsequently. She reports that her mother died after the separation from her father and that the death was somehow alcohol related.
It is curious to note that Stacie's father, Mr. M., who is seeking guardianship or adoption of Dalilah in this proceeding, was himself separated from his mother at an early age and raised by his father. He lived with his father and visited his mother every few years even though she lived nearby. Mr. M. did not know why his father got custody and never asked. Stacie's father had a similar pattern in his life as his father, in that he married an alcoholic woman, whom he divorced, and like his father, got custody of his child. (See Petitioner's Exhibit 14, pp. 10-11.) As Dr. Berkowitz reported, "we see this multi-generational history of mothers leaving the child, his mother, his wife and now his daughter all walking away from their child." (Testimony of Dr. Barbara Berkowitz.)
Mr. M., Stacie's father, was awarded custody of Stacie in a divorce which occurred on February 2, 1977. Stacie became known to the DCF in 1984 when her father requested placement for her. She was nine years old. Mr. M. indicated he was unable to manage Stacie's behavior and that he might hurt her if placement was not effected immediately. (Petitioner's Exh. 7, pp. 4-5.)
Two years before that, Mr. M. had remarried and the Social CT Page 6823 Studies report that his second marriage was severely conflicted. During that period, Stacie was in therapy at Newington Children's Hospital. Stacie's therapist reported, "the current problem has to do with the inability of the father and the stepmother to respond consistently, lovingly and effectively to Stacie's very provocative behavior at home. . . . I am concerned, as I explained to you, about consistency for this child who has had a long succession of different mother figures." The doctor indicated that Stacie did not need to be placed outside of her home, but rather needed consistency from her father who was often away due to his job. Mr. M. was not willing to change his job, which the doctor felt could have had a significant benefit for Stacie. (Petitioner's Exh. 7, p. 4.)
The evidence supports a finding that Stacie's problems began as early as when she was five years old. Her problems included disruptive behavior and refusal to pay attention, both of which are symptoms consistent with fetal alcohol syndrome. In May 1985, when Stacie was ten years old, she was placed at the Cromwell Children's Home, where issues identified for her included a low trust level, her belief that adults were incapable of caring for her and her belief that she was unloved. At Cromwell, an assessment was made that Stacie had been sexually abused.
Dr. Shapiro-Weiss' impression was that Stacie had extensive sexual abuse. Stacie further indicated to the staff at Cromwell that it was "her prayer that her father would leave her alone and let someone adopt her." (Petitioner's Exh. 7, p. 5.) At no time however, was there any disclosure by Stacie as to any sexual molestation. While the staff's conclusion that she had been sexually abused was reached after Stacie had spent a weekend at home with her father, Stacy never said that her father in any way sexually abused her.
The therapist at the Cromwell Home suggested to Mr. M. that Stacie's placement be changed to specialized foster care. Cromwell reported that "they did not question the genuineness of Mr. M.'s caring for his daughter, yet he had shown little insight into the severity of her problems, had shown little change in behaviors he knew effected Stacie negatively, and when confronted, he defended himself through aggressive, hostile behavior." (Petitioner's Exhibit 7, page 6.) Mr. M. did not agree with specialized foster care for Stacie and he removed her from Cromwell Children's Home against advice on January 9, 1987. She had been in Cromwell Children's Home for nearly eighteen months. CT Page 6824
During the following year, Stacie spent time with her paternal grandparents in New Hampshire. However, her behavior was too disruptive and she returned to her father. On February 9, 1988, Mr. M. notified DCF he again wanted placement for Stacie. The agency began to obtain psychological evaluations and to arrange preplacement interviews at various facilities for Stacie. It was during this time that Mr. M. developed a very antagonistic attitude toward DCF.
 The case record indicates that during the time DCF was attempting to obtain placement for Stacie, Mr. M. became extremely angry at the agency. The case record documents unannounced office visits and phone calls where Mr. M. screamed at the worker and demanded to know who wrote the referral packet and who typed it. The record indicates he was not satisfied with the answers and asked who he could contact higher than the social worker or social work supervisor. At that time Mr. M. was given the name of the commissioner of the department as well as other administrative officials. (Petitioner's Exh. 7, p. 7.)
Since Mr. M. indicated he was unable to maintain Stacie in his care while awaiting residential placement, he signed a voluntary permission from for her to be placed on April 27, 1988, and she was placed in a foster home on that date. (Petitioner's Exh. 7, p. 7.) The record is replete with various placements for this thirteen year old child following this brief placement. Those placements included the Salvation Army Youth Emergency Shelter in Waterbury, Waterbury Hospital, a shelter in Waterbury, the Salvation Army Emergency Shelter in Hartford, the ABC Unit at Mt. Sinai Hospital and a residential facility in Durham known as Lake Grove. (Petitioner's Exh. 7, pp. 7-8.) While at Lake Grove, Dr. Gallalee, a psychiatrist, and Stacie's father felt that Lake Grove was not the best place for her. Dr. Gallalee stated that Stacie was "an extremely disturbed girl whose disturbance goes back to early childhood. What is remarkable in reviewing her record is the consistency of her disturbance and its seemingly intractable nature." (Petitioner's Exh. 7, p. 8.) Stacie remained at the Lake Grove school from July 14, 1988 until April 1990.
Just before this same period, Mr. M. divorced his second wife in 1987. There had been one child born to this marriage, Shawn. This child was living with neither Mr. M. nor Mrs. M., but CT Page 6825 instead, living with an aunt. (Petitioner's Exh. 7, p. 9.) The reason that neither parent had custody was not explained.
Mr. M. married a third time in May 1989. The records at Lake Grove suggest that Stacie had placed herself on restriction through her own behavior because she did not want to attend the wedding. After Lake Grove, Stacie was placed at the Vitam Center in Norwalk, Connecticut. Her initial diagnosis was depression, oppositional defiant disorder, alcohol abuse, marijuana abuse and cocaine abuse. The reports indicate that she ran away from this facility on three occasions, each time engaging in sexual activities with strangers and active drug use. Thereafter she was admitted to the psychiatric unit at Norwalk Hospital, and later, Housatonic Adolescent Hospital, a facility for long term treatment of emotional difficulties and multiple conduct problems. It was noted at that facility that Stacie's neediness and fear of abandonment seemed to be masked through her aggressive behavior. While she was there she was absent without permission on several occasions, during one of which departures she was allegedly raped. While at Housatonic it was reported that she engaged in sexual activities with at least one other resident. She was released from Housatonic at the facility's request and placed in a DCF specialized foster home on March 5, 1992. She remained there for about two months, often inviting young men to the foster home with whom she was sexually active. She was removed from that home on May 13, 1992 and thereafter began moving among the homes of various friends in the Danbury and Wallingford area, according to the Social Study. (Petitioner's Exh. 7, pp. 9-11.)
In September 1992, Stacie turned eighteen and signed a statement indicating that she wished to leave the care of DCF. From September 1992 until Dalilah's birth in 1994, Stacie was not in contact with DCF. (Petitioner's Exh. 7, p. 11.)
Dalilah was born on January 6, 1994 at the New Britain General Hospital. The day following her birth, the social worker from the hospital contacted DCF. An affidavit attached to the original Order of Temporary Custody, which was dated February 7, 1994 and signed by A.M. Capriglione, M.D., Chief of Pediatrics at New Britain General Hospital, indicates that a premature female infant was born to a nineteen year old mother with a history of depression, cocaine, alcohol and marijuana use in the past. "Toxicology screens early in pregnancy were positive for marijuana. The mother, however, stated she had not used any CT Page 6826 substances for nine months prior to delivery." The concern of the pediatrician was not so much Stacie's past history but with her observed behavior while the baby was hospitalized.
 My concerns, however, centered more significantly on maternal ability to provide care and feeding to this infant. Her behavior in the Nursery has been erratic and distracted. She had had difficulty completing feeds and maintaining attention to her immature, small infant. Many of her statements had been contradictory (ie, desire to breast feed, removal of a previous child by DCF vs. never having had a child before, etc.). My review of the nursing notes revealed that the mother continued to have difficulty in maintaining steady infant-care practices. Due to these concerns, I contacted a DCF supervisor and requested a re-review of their decision. In addition, I discussed my concerns with Stacie, herself. Final decision by DCF at that time was for discharge to mother with close follow-up by both DCF and VNA. The baby, therefore, was discharged on 1-14-94 with close follow-up as outlined above.
(2/7/94 Affidavit of A.M. Capriglione, M.D., New Britain General Hospital.)
According to information provided to Dr. Berkowitz by Stacie, (Petitioner's Exhibit 14, p. 26) after discharge from the hospital, she and the child returned to Stacie's apartment. The child cried a lot and was difficult for Stacie. She felt very much alone and stressed out by the child crying so much and being unable to be comforted. Stacie went to AA because of her "pot addiction." She could not return to her father's house to live since he would not permit her to live there with the child, so Stacie had some of her friends bring her to her grandmother's home in New Hampshire. She stayed there for about a week and returned to Connecticut to be nearer her friends. She felt too alone and stressed to continue to care for a colicky child on her own. She entered a shelter in Meriden and later, a shelter in Bristol. (See Summary of Facts attached to initial neglect petition dated 2-10-94.) She appeared at one shelter with no diapers or food. She did not apply for any state or federal financial assistance. When the baby cried at night, Stacie slept through it. Residents complained of her neglecting the child, swearing at the child and shaking the baby. She left to live with CT Page 6827 an older, male friend she had met at AA. DCF had received three referrals about Stacie's conduct with the child. Given her history of substance abuse, her prior history as a committed child, and the referrals for not feeding the baby at night, shaking and swearing at the baby, DCF obtained an Order of Temporary Custody on February 10, 1994. The child had been released from the hospital to Stacie on January 15, 1994; the child was removed on a 96-hour hold by DCF on February 7, 1994. Stacie had had the child in her care for three weeks.
Prior to the child's placement and while the child was being protectively serviced by DCF, Linda Ventrelli of DCF contacted the paternal grandfather to see if he was willing to provide a home for his daughter and granddaughter. The paternal grandfather, Mr. M., indicated he could not provide a home for them because there was serious conflict between his third wife and his daughter. He offered to take Dalilah alone. Since DCF's goal must be to work to preserve the parent-child relationship and to reunify the parent and child if the child is removed from the home, the agency decided not to place the child with Mr. M. because of the lack of harmony and the discord manifest toward Stacie in Mr. M.'s home. It was believed that the child should be placed in a foster home where Stacie would be welcome and visitation could be amicably arranged. The child was placed with the present foster parents on February 7, 1994, and has remained there to this date.
As indicated earlier, Stacie was absent for much of the trial. She presented no plan for Dalilah's care. The psychologists have testified that she is not able to parent Dalilah at this time, nor can it be expected that she will be able to parent her in the near future. As recently as June 1996, Stacie was in Hillcrest, which is a detoxification unit of New Britain General Hospital. Stacie was in to detox from ten bags of heroin a day. She left prior to completing detoxification, against medical advice.
Angel C. was incarcerated and awaiting trial on June 25, 1993 when Stacie was about two months pregnant with Dalilah. Angel was convicted of assault in the second degree (Conn. Gen. Stat. §53a-60) and carrying a dangerous weapon (C.G.S. § 53-206 (a)) on December 17, 1993. (See Petitioner's Exh. 21.) He was sentenced to an effective sentence of five years, execution suspended after 42 months, with three years of probation. The child was born on January 6, 1994. Angel did not see the child CT Page 6828 while he was incarcerated. He was released to a half-way house on August 31, 1995. DCF arranged weekly visitation for him beginning in October 1995. By then, Dalilah was nearly two years of age. Mr. C. went to weekly visits, sometimes alone, twice with his mother, and several times with Stacie.
 On 2/27/96, Stacie visited Dalilah for one hour at the DCF office. Angel and paternal grandmother visited child after [Stacie's] visit. Worker noted that during this visit, it took Angel approximately 15 minutes to settle in to visit. He kept leaving visiting room and approaching Stacie who was sitting in waiting area of DCF office. [sic]
 On 2/28/96, . . . supervisor contacted worker and informed worker that Angel had brought a gun to DCF office during his visit. Apparently, the DCF guard confiscated the gun after the visit which was found in a paper bag. The next day Stacie came to retrieve the gun. When she learned that the police were notified, she left. (Petitioner's Exhibit 19, pp. 4-5.)
After this incident, DCF suspended visitation rights. In June 1996, Angel was incarcerated again for the weapons related violation. His release date is December 1997.
Angel has never parented the child Dalilah. His conduct has made him unavailable to parent her. He has no plan for the child's care and wishes that Mr. M., the maternal grandfather, adopt the child. The psychologists' reports indicate Angel has no parent-child relationship with the child and it does not appear that he has ever had such a relationship with the child.
 It is recommended that the parental rights of Stacie M. and Angel C. be terminated. Neither of them appear to be capable of currently serving as an appropriate, full-time parent for this toddler. Nor does it appear that they would be able to do so in the relatively near future. It is neither fair nor psychologically healthy to delay Dalilah's permanency planning further in the hopes that either or both of them could be sufficiently rehabilitated to parent her. She has already waited for two years, almost her entire life, and her birth father cannot seem to successfully remain free from incarceration and her birth mother continues to have difficulties with explosiveness, authority figures, cooperation and life skills . . . In addition there is no CT Page 6829 stable, committed relationship between the birth parents, such that they could supportively and cooperatively co-parent this young child.
(Dr. Berkowitz, Petitioner's Exhibit 14, p. 42.)
 In my opinion, Miss M. has shown no ability or plan which would suggest any hope that she will be able to develop the skills necessary to care for her infant within a time frame that would not be severely detrimental to her child's emotional well-being.
(Richard Sadler, M.D., Petitioner's Exhibit 13, p. 8.)
While Dr. Bruce Freedman was asked to evaluate the case for the termination of parental rights on two occasions, he did not at any time articulate that Stacie should be terminated as a parent. He spent a good deal of his time advocating for the paternal grandfather as a placement resource. In an early report he did say, "this psychologist frankly suspects that mother would not be likely to rise above the qualifications to be a visiting resource in the future." (Maternal Grandfather-Intervenor's Exh. 4, p. 15.)
The court places great weight on the opinions of the experts in this case, but does not abdicate its own responsibility to ultimately decide the issue. In re Teshea D., 9 Conn. App. 490,493 (1987).
ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds from the foregoing factual findings, the testimony, documents in evidence, social studies, and the evaluations, by clear and convincing evidence existing at the date of trial:
The child has been found in a prior proceeding to have been neglected on April 20, 1994 (McWeeny, J.). The court finds that at the time the petition was filed, the parents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, Dalilah Rose. CT Page 6830
The facts previously found also support the finding that there is no ongoing parent-child relationship with respect to the parents as defined by law. The court is mindful of the holdings in In re Valerie D., 223 Conn. 492 (1992) and In reShannon S., 41 Conn. Sup. 145, 158-60 (1989), that is, that the state cannot take an infant away from the parent at birth and thus, inexorably prevent the parent from establishing a relationship with their child. The court is satisfied that the evidence clearly and convincingly establishes that Dalilah has no positive feelings for the parents and that whatever relationship may have existed, either from the early days when Dalilah lived with her mother or from the sporadic visitation Stacie has maintained, has been completely displaced. The court specifically finds that the parents' personal conduct has prevented the creation or maintenance of such a relationship.
It is specifically noted that DCF's early efforts placed the child in a foster home that worked with Stacie to maintain a parent-child relationship through almost open visitation, and that DCF and the foster parents wanted reunification to work. The foster parents in this case opened their home to Stacie. While the foster mother quite accurately noted that she knew almost immediately that Stacie would never effectively overcome her own neediness such that she could provide the necessary self-sacrifice to effectively parent, the foster mother also recognized that what Stacie needed, more than anything, was a mother for herself. (Testimony of foster mother.) Stacie was never mothered. The foster mother, who was very supportive and non-judgmental of Stacie, said, "I wish I could have done more to help Stacie."
Stacie has no capacity to mother a fragile, demanding infant. Stacie's condition and behavioral difficulties long antedated DCF's intervention in this case. The state did not "create the conditions that will strip an individual of an interest protected under the due process clause." In re Valerie, supra,223 Conn. at 534. The state, in this case, has gone to great effort to rehabilitate Stacie.
The Court further finds that the grounds for termination have existed for more than one year.
DISPOSITION
It is not sufficient to find that grounds for termination CT Page 6831 exist. The court must also determine, pursuant to General Statute § 17a-112 (d), as amended, if a termination of parental rights is in the best interests of the child. The court must make this finding by clear and convincing evidence. Practice Book § 1050.1(3). The court will consider the mandatory findings in making its best interest determination.
The court makes the following factual findings pursuant to General Statute § 17a-112(d).
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, transportation assistance, and visitation coordination. Prior to placement, DCF attempted to initiate the services of a visiting nurse, the Klingberg Family Center Family Preservation Program, referrals to shelters, and transportation for appointments. (Petitioner's Exh. 7, p. 24.)
Later, extensive services were offered through the Casey Reunification Program and offers of drug abuse treatment facilities. Angel C. was unavailable for DCF assistance through his incarceration, although visitation services were arranged upon his release. He was provided with services from other sources, including his half-way house and the office of adult probation.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunite the parents and child, given the situation and circumstances, as far as possible. The biggest single step to try to make reunification a reality was to place the child with a foster family that would support Stacie's efforts and make visitation as stress-free and available as possible. The foster family did that. If the child had been placed with the paternal grandfather, it is likely that Stacie would have become discouraged from visiting and reunification would have been even less likely. Angel C.'s incarceration and denial of paternity made reunification efforts with him inappropriate.
3) The Department, with the approval of the Court, set reasonable and realistic expectations for Stacie in order to reunify the family. (Petitioner's Exhibit 1.) There was only minimal compliance by the mother. There was no compliance or participation by the father for most of Dalilah's life, since Mr. C. was incarcerated and had initially denied paternity. CT Page 6832
4) The child has strong emotional ties with the foster family that has provided the physical, emotional and educational support this child needs. The child has no positive emotional ties to the biological parents. Dr. Berkowitz views Dalilah's relationship with Stacie as . . . "a mostly nice person with whom she (Dalilah) sometimes plays." (Pet. Exh. 14, p. 33 and testimony.) All evaluators who considered the foster parents in their evaluations consider the child to be strongly attached to the foster parents and have concluded that they represent the only stable parental caretakers the child has ever known.
Even Dr. Bruce Freedman, whose reports appear to be actively advocating for placement of Dalilah with the paternal grandfather states:
 The [foster parents] were obviously extremely attached to Dalilah, had provided an excellent home for her, and would be emotionally devastated if they had Dalilah taken away from them. They provided attention and affection, guided her behavior expertly, and had shown a steadfast commitment to her care. (Maternal Grandfather-Intervenor's Exhibit 5, p. 6.)
The court agrees with Dr. Berkowitz's testimony that with the foster family, this child has the opportunity to grow up with a woman whom she views as a mother and who has mothered her. Neither the natural mother nor the paternal grandfather were effectively parented by a mother-figure.
5) Finding regarding the age of the child. This child is nearly three years of age. The child requires stability of placement and continuity of care. Every child requires a sense of personal security and belongingness to a familial group. The child must feel a mastery of her own environment, stability, consistency, and certainty in her life. This is particularly true in Dalilah's case, according to Dr. Berkowitz, where the child must overcome the effects of her already precarious beginning in life, which may have included exposure to drugs, alcohol and poor nutrition during gestation; and possible abuse and neglect during her first month of life. (Petitioner's Exh. 14, p. 43.)
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interest of the child to return her to her home in the CT Page 6833 foreseeable future, etc. The parents have not made realistic and sustained efforts to conform their conduct to even minimally acceptable parental standards. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C. 210 Conn. 157 (1989); In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 15 (1981). Stacie has enormous personal, psychiatric and drug-related problems that need to be addressed. Angel has problems with socialization and adjustment difficulties; he cannot read or write; he has no employment history; and he is suffering a second incarceration for having a weapon while on probation and bringing it to a visit with Dalilah. (Dr. Freedman's report, Maternal Grandfather-Intervenor's Exh. 4, p. 6.)
7) Finding regarding the prevention of a parent from having a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. While the parents' means were limited, economic factors did not prevent regular, continuing contact with either the child or the foster family. The Department attempted to encourage visitation. No unreasonable conduct is noted as between the parents.
While the statute does not require the court to evaluate the conduct of DCF toward third parties, some mention of this topic is necessary since one of the social worker's conduct created unnecessary pain and hardship on some of the family members involved in this case. The first social worker Linda Ventrelli, was very appropriate and professional. The worker who took over the case on March 4, 1994 did not act as responsively and professionally as she could have to reduce the tension and anguish of the families involved.
There were basically three areas of conduct that were not well handled. They relate to Bruce M., the maternal grandfather and his third wife; the paternity issues of Angel C.; and the visitation and transition issue regarding Dalilah.
As is commonly the case in cases brought before the juvenile court, as soon as the procedural formalities of the first court appearance have been resolved, the parties are usually required to submit to a psychological evaluation. In this case, Dr. Bruce Freedman, a Bloomfield clinical psychologist, evaluated the CT Page 6834 biological parents, the maternal grandfather, Bruce, and his wife Denise, and the paternal grandmother, Irma, and her husband Antonio R.
On March 21, 1994, when Dalilah was ten weeks old, Dr. Freedman found that both sets of grandparents offered some advantages. (Maternal Grandmother-Intervenor's Exh. 4.) With respect to the paternal grandparents, there was the possibility that Angel was not the father, although the psychologist suspected that he was (p. 15). Dr. Freedman found the paternal grandfather to offer some limitations because of two discs removed from his back (p. 7), but that the chief advantage in that family was Irma, the paternal grandmother, who "could train maternity nurses. She was loving, attentive, and expert with the baby . . . . [They] seemed well-qualified to provide care also, and liberal visiting should be arranged with them, such as for three weekend days per month. . . . They would offer a rich Hispanic heritage, which would be especially appropriate if Angel turned out to be the baby's father" (pp. 14-15). The social worker offered them no visitation whatsoever.
Since paternity had not been resolved, Dr. Freedman found the maternal grandfather and his wife as the best placement option. "The M.'s offered a certain future based on established maternity, with a commitment which they promised would extend to maturity, or as long as necessary." (Maternal Grandfather-Intervenor's Exhibit 4, p. 14.)
The DCF social worker apparently was not impressed with Dr. Freedman's findings. She knew that Stacie did not want the child placed with her father and step-mother, whom Stacie intensely disliked. The worker was certain that they would not permit Stacie the kind of access to the baby that Stacie wanted. It was also clear under the grandfather's plan that since he and his wife Denise both worked, the child would be in day care all day. The social worker also knew that the paternal grandfather had a history of unsuccessful relationships with women, that Stacie was a "bad advertisement" (Dr. Freedman's words; Maternal Grandfather-Intervenor's Exh. 5, p. 6) for Mr. M.'s parental abilities, and that there had been unresolved and unsubstantiated suggestions that he had sexually abused Stacie. Given also, Mr. M.'s often "angry, hostile and uncooperative" attitude toward DCF in general, and to this case worker in particular, it was probably no surprise that DCF did not rush to implement Dr. Freedman's recommendations. The problems between the caseworker CT Page 6835 and Mr. M. are set out at pages 13-22 of the Social Study (Petitioner's Exhibit 7). The social worker offered the paternal grandfather and his wife one visit for one hour per month at the DCF office in New Britain "which the agency felt was adequate in order to keep Dalilah familiar with him and his wife, should the plan for reunification change and placement in their home be determined to be best for Dalilah." (Petitioner's Exh. 7, p. 15.) The manner in which visitation occurred will be discussed later.
The second major problem area relates to Angel disputing paternity. Dalilah was born on January 6, 1994, and she was removed from Stacie's care with an Order of Temporary Custody issued on February 10, 1994. At the mandatory ten-day hearing which was conducted on February 16, 1994, Judge McWeeny ordered paternity testing to be performed.
The DCF caseworker told Angel that since he was contesting paternity, his parents would not be permitted visitation rights. Angel did not request any visitation himself.
The caseworker testified that she had never before been involved with a case in which she was required to arrange paternity testing for an incarcerated inmate. She also said that paternity testing could not be performed until the child was six months old, which would have been on or about July 6, 1994. Arrangements could have been made before that date. confirming his paternity was completed on July 25, 1995. (Petitioner's Exhibit 8.) It was received by the court sometime thereafter.
During this entire period of 18 months, a decision had already been made to terminate Angel's parental rights in October 1994, since he was offering no plan for Dalilah, contesting paternity and had expressed an interest in releasing his rights. The tragedy is, however, that the paternal grandmother who, per Dr. Freedman, "could train maternity nurses" and "was loving, attentive and expert with the baby" and seemed "well-qualified to provide care," was wholly pre-empted from consideration as a placement resource within the biological family constellation — all by the failure to promptly complete the paternity testing and by the decision not to allow the paternal grandmother visitation until paternity was established. The court cannot imagine why the agency did not actively seek the participation of a potential placement resource who came highly recommended by the court-appointed psychologist, even if paternity was being disputed! Dr. Freedman, selected by DCF to do CT Page 6836 the evaluation, indicated he suspected Angel to be the father, the paternal grandparents were found to have many good qualifications and were interested in caring for the child. Dalilah could only have been enriched by such an association even if it was later concluded that Angel was not the father. Since she the paternal grandmother was not allowed to visit Dalilah, she apparently lost interest in the court battle and did not attend the evaluation with Dr. Berkowitz. (See Petitioner's Exhibit 14, p. 42.) In retrospect, she appears to have been the best alternative within the family for a successful placement.
The third area of problems relates to the visitation that was permitted by the DCF caseworker. Mr. M., the maternal grandfather, and his wife were permitted one hour per
Some other dates are important to understand the chronology of events. Dalilah was committed to DCF on April 20, 1994. An Administrative case review was done on April 22, 1994 at the Garner Correctional Institution where Angel was incarcerated. Angel refused to sign the report. Angel's Inmate Number is noted on the Administrative Review of Treatment Plan. (Petitioner's Exhibit 10.)
The caseworker indicated in her testimony that she had some difficulty arranging blood testing because she usually sent the parties to a laboratory or hospital, but since Angel was incarcerated, she didn't know who could do the testing. She testified that ultimately, she called the Juvenile Matters Court Services Officer in Hartford, who immediately told her that Roche Biomedical Laboratory in Norwich was routinely used for incarcerated subjects.
On December 28, 1994, in the Hartford Superior Court for Juvenile Matters, where the paternal grandfather was seeking restoration of his visitation privileges with Dalilah, Judge Keller ordered visitation and directed that the previously ordered paternity testing be completed as quickly as possible. On January 9, 1995, nearly a year after the testing was ordered, the caseworker wrote to Roche Biomedical Laboratory to request the testing. (Respondent Father's Exhibit A.) Since the caseworker had not provided the laboratory with Angel's Inmate Number, the lab was unable to locate Angel since there were several inmates with the same name. When they finally found him, the lab then arranged a visit on April 27, 1995. Apparently Angel was not at the institution, having been transported to court. The next CT Page 6837 visit, in May was canceled due to a death in the phlebotomist' family (Petitioner's Exhibit 15.) Angel's blood was finally drawn on June 12, 1995, and the report month in New Britain at the DCF office. He had sought visitation the day Dalilah was committed, April 20, 1994. A visit was arranged for May 6, 1994. The child was four months old. The caseworker said that conflict developed almost immediately.
The caseworker testified that at the first visit in May, Mr. M. was angry at the infrequency of visitation and the location. She indicated Mr. M. did not seek a visit in June; due to vacations in July, visitation could not be arranged; and in early August, his wife called and wanted visitation the next day. She was advised that visitation could not be arranged that quickly. When she asked for August 15, 1994, the worker said she, the caseworker, would be out of state. They agreed upon August 26, 1994. Later that same day Mr. M. called back and was loud and angry that he felt he was being denied visitation. The worker said he had no court order, that maybe he should get a lawyer. Mr. M. felt the worker was being condescending and patronizing; that visitation depended upon the worker's beneficence. The worker discussed the visitation problems with her supervisor and the two of them agreed to effectively end Mr. M.'s visitation.
It wasn't until December 28, 1994 that a court order was obtained granting Mr. M. visitation with Dalilah. Counsel and the caseworker agreed upon January 20, 1995 as the date for the first visit. The child was one year old. The paternal grandfather hadn't seen the child since May 6, 1994. The foster mother brought the child for the visit.
According to both the social worker and the foster mother, Mr. and Mrs. M. would come to the DCF building, take the child without acknowledging the foster parent, go directly into the small visitation room and close the door. Especially during the earliest visits, the child would cry and sob for the entire hour.
Two aspects of this are especially troubling to the court. First, the caseworker did not exercise control over the early transitional visits to have the child introduced to the paternal grandfather and his wife in a gradual and regulated way to avoid the trauma of being locked in a room with virtual strangers. For example, the foster parents should have been permitted to remain in the room until Dalilah was more at ease with her paternal grandfather. Secondly, the foster parents, for good and CT Page 6838 sufficient reasons which shall be explained later, did not call the child "Dalilah" at all. They called the child "Maggie." The caseworker knew how the child was called and never advised the paternal grandfather, so that, the paternal grandfather and his wife were calling the child by an unfamiliar name, "Dalilah," during their visits. This caused unnecessary pain and hardship to both the child and the grandfather.
In light of the problems presented to the paternal grandfather, the court has relied in its evaluation of dispositional alternatives not upon the tortured progress of visitation, but rather upon other factors produced in other evidence, to decide what is in the best interest of the child.
The paternal grandmother has regrettably, been preempted from consideration by the delay in resolving the paternity issue and the failure of DCF to act on Dr. Freedman's recommendations.
The court adopts the findings of Dr. Barbara Berkowitz in its assessment of the paternal grandfather.
 In summary, Bruce M. is an angry, non-introspective man, who takes no responsibility for anything amiss in his own background as a father or grandfather. He strongly externalizes blame for all of the difficulties that have occurred since Dalilah's birth, and with Stacie beforehand. . . . Unfortunately, he seems to have changed little from the past, in this regard, and still has had considerable difficulty forging cooperative relationships with authority figures in the child welfare and mental health systems. Although he attempted to be tactful in his comments about such personnel during this evaluation, his contempt and disregard for them was clearly evident, as were his litigious threats. Like his daughter, he easily perceives slights and "violations" of his rights, causing confrontations rather than leading to communication designed to clarify misunderstandings. (Petitioner's Exhibit 14, p. 15)
The paternal grandfather's plan is for he and his wife to care for the child. His wife is viewed by Dr. Berkowitz as "rigid, aloof, not a warm person, with her own set of difficulties." Neither she nor her husband planned to have any children when they married. They both work and they planned to put Dalilah in day-care if the child were placed with them. CT Page 6839
The foster parents are James and Kathleen W. They were permitted to intervene and both testified. They indicated that the child was brought to them on February 5, 1994 at 3:00 in the afternoon as an urgent placement. They were not told of any possible relative placement. They were told that the baby was a "shaken baby" whose mother hadn't been feeding her. The child had viral pneumonia; a diaper rash; conjunctivitis to the point that Dalilah's eyes were "practically glued closed"; she had concave breathing; colic, which was later determined to be from lactose intolerance; and tremors that were so bad that the foster mother strapped Dalilah to her chest in a baby carrier and she and her husband took turns holding her around the clock. They thought she was to be there for only 96 hours so they held her and called her Maggie rather than the name — Dalilah — that they were told had been screamed at her by her mother.
The record, the evaluations and the court's own observations are that the foster parents have provided superlative care for the child and are bonded as closely to her as she is to them. Mrs. W. is a nurse by training but is at home full time raising her other children and Dalilah. Dalilah is as much a part of the family as if she were their biological child. Developmentally, she is doing quite well. To remove the child from this home would be emotionally equivalent to the death of her parents. The court firmly believes that the clear and convincing evidence establishes that it is in the best interest of Dalilah to permanently remain in the care of the foster parents. They have expressed an eagerness to achieve this end. The evidence overwhelmingly supports such an outcome.
ORDER
The court having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Stacie M., the biological mother, and Angel C., the biological father. Accordingly, it is ordered that their parental rights to the child, Dalilah Rose N. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file CT Page 6840 with the court, no later than ninety (90) days following the date of judgement, a written report toward such permanent placement and file such further reports as are required by state and federal law. If for any reason the foster parents are not to be the adoptive parents, the Commissioner shall notify this court and an immediate hearing shall be scheduled to consider any reasons for a change in the presently contemplated plan of adoption. Dated at Middle town this 16th day of December, 1996.
FOLEY, J.