MEMORANDUM OF DECISION
On January 22, 1999, the Department of Children and Families ("DCF" or "petitioner") filed petitions to terminate parental rights concerning two children, Michael W. ("Michael") and Katherine J. (the "termination petitions"). Named as respondents in the petitions were Laurie J., mother; Michael W., father of Michael; and Michael D., also known as Sean D., father of Katherine.[2] The termination petitions were subsequently amended, as discussed below.
Previously, on August 17, 1998, DCF had filed a petition alleging that Katherine had been neglected (the "neglect petition"). Laurie J. and Sean D. were named as respondents. By order dated June 17, 1999, the court (Harleston, J.) consolidated the neglect petition with the petitions for termination of parental rights as co-terminous actions to be tried together. A subsequent order, issued at a hearing on August 13, 1999, directed that Michael W.'s Motion for Revocation of Commitment, dated August 5, 1999, be considered at trial.
Trial concerning the petitions was held on January 19, 2000; March 28, 2000; April 25, 2000; May 4, 2000; and May 22, 2000. Nine witnesses testified and twenty-two exhibits were admitted in evidence. Post-trial briefs were submitted by the parties, the last of which was received by the court on July 24, 2000. For the reasons stated below, the court finds that Katherine was neglected and grants the termination petitions. In view of the decision to grant the termination petition as to Michael, the Motion for Revocation of Commitment is denied.
FACTS
The court finds the following facts and credits the following evidence, except as noted. CT Page 8851
A. Background of the Case
Michael was born on April 21, 1997. A little over two weeks later, on May 9, 1997, an order of temporary custody ("OTC") was issued and a neglect and uncared for petition was filed with the court concerning him. Laurie J. admitted to using crack cocaine during her pregnancy. Michael was hospitalized after his birth and was then placed in foster care.
On October 9, 1997, Michael was adjudicated as a neglected child. His custody was committed to DCF for up to twelve months; the commitment has been extended since that date. Also on that date, the court entered Expectations directed to Michael W. Court Exh. 1. These were signed by Michael W. and his attorney. They included: (1) keep appointments set by or with DCF; keep whereabouts known; (2) visit the child as often as DCF permits; (3) participate in parenting counseling; (4) secure/maintain adequate housing and income; (5) no substance abuse; and (6) no involvement with criminal justice system.
Katherine was born on July 26, 1998. As to her, an OTC was issued by the court on August 17, 1998, when the neglect petition was filed. At that time, it was found that Laurie J. had left Katherine in the care of a person whose full name or address she did not know. Katherine was placed in the same foster home where Michael was located. They have remained with the same foster family since they were placed.
Specific Steps were issued as a court order on August 21, 1998, directed to Laurie J. and Sean D., in conjunction with the OTC concerning Katherine. Childrens' Exh. 5. They included the same provisions as listed above in connection with the Expectations concerning Michael, with the following additions: participate in individual counseling, submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment: follow recommendations of therapist; and accept and cooperate with in-home support services. At a hearing before the court on September 14, 1998, the court noted that the Specific Steps were still in effect.
On September 10, 1998, as to Michael, the court found that reunification efforts directed to Laurie J. and Michael W. were no longer appropriate.
By motion to amend, dated May 3, 1999, and filed May 6, 1999, DCF sought the court's permission to amend the petition seeking termination of parental rights concerning Michael, by adding the ground that his parents had failed to be rehabilitated. The proposed amendment also added CT Page 8852 the allegation that there was no on-going parent-child relationship between Michael or Katherine and their respective parents.[3] The court granted the motion to amend, thereby changing the adjudicatory date from January 22, 1999, the original filing date, to May 6, 1999. On May 22, 2000, the parties agreed that this was the adjudicatory date.
On the third day of trial, April 25, 2000, after review of a court-ordered report from Dr. Marvin Zelman, M.D., a psychiatrist, concerning Laurie J.'s mental competence to understand the proceedings and assist her attorney (Exh. 6), the court found her to be competent. On the next trial date, May 4, 2000, Laurie J. and her attorney presented, in writing, her consents to the termination of her parental rights as to both children. After canvassing her, the court accepted her consents and found them to be knowing and voluntary.[4]
B. Michael W., father of Michael
Michael W. was born in 1976. He completed the eleventh grade and graduated from a technological institute. He works as a mechanic and as a delivery driver. As a child, he was diagnosed with a rare bone and skin disease called Histicytosis X. He was treated for this condition between the ages of two and five years. He reports this condition as having been in remission for an extended period of time.
He met Laurie J. through a friend. When she became pregnant, after they had been together for two years, she told him he was the father. Initially he thought he was. However, at the time of Michael's birth, Michael W. did not admit to paternity. His relationship with Laurie J. had ended while she was pregnant. Paternity testing was scheduled twice due to his lack of follow through with DCF. He did not promptly acknowledge paternity of Michael because he claimed he had been informed that Laurie had been "sleeping around." On September 23, 1997, after his attorney called to inquire, DCF records indicate his paternity was confirmed by test. Exh. F (DCF narrative) at 2. Later in the same month, Michael W. stated to DCF that he "wants the baby after one year, when he is more stable with a job." Id. He has provided gifts for Michael, starting with Christmas in 1997 and on birthdays. After Michael's birth and until he decided to contest the termination petition, he presented no plan for Michael's care.
C. Sean D., father of Katherine
Sean D. was born in 1974. He reported being physically abused by grandparents, who raised him during much of his childhood. Subsequently, he was raised by his mother. He completed the tenth grade and obtained a G.E.D. certificate in 1996. CT Page 8853
In 1992, he was arrested for sexual assault in the first degree and risk of injury to a child. After being convicted of these charges in 1993, he was incarcerated until May, 1997. After his release, Laurie J. and he were together in a relationship. He worked in construction at that time.
On January 4, 1998, he threw Laurie J. off the porch of her home and set it on fire. As a result of this incident, in December, 1998, he was convicted of arson in the first degree, assault in the second degree, and violation of a protective order, and sentenced to twenty-five years of incarceration, to be suspended after serving fifteen years, and five years of probation. Exh. 5 (certified copy of criminal record). At the time of his first date of eligibility for release in 2010, Katherine will be approximately twelve years old.
On January 21, 1998, Sean D. learned from Laurie J., by letter, that she was pregnant. He was already incarcerated at that point. Laurie J. told him he was the father, but later sent him a letter, dated August 19, 1998, three weeks after Katherine's birth, saying he was not. Until getting the August letter, he believed he was the father. Children' Exh. 6 (excerpt from testimony at administrative hearing). He was not listed as the father on her birth certificate. Sean D. was angry at Laurie and did not acknowledge paternity. Instead, he denied paternity and asked for a paternity test. He did not acknowledge paternity until January 12, 1999, five-and-a-half months after Katherine's birth and ten days before the petition seeking termination of his rights was filed. Apparently, he waited to do so until after seeing his daughter's photograph, the first of which he received in October or November, 1998.
In August, 1998, although he had not acknowledged paternity, he proposed his mother as a parental resource for Katherine. Due to a risk of injury charge, as discussed below, she was not considered. Sean D. was informed of this in the fall of 1998 at a court appearance. No other plan was offered by Sean D. for Katherine's care.
Sean D.'s mother. Deborah G., testified at trial. Although she had previous knowledge of the proceedings (and was asked to intervene by her son in August or September 1999), on the third day of trial, April 25, 2000, for the first time, she presented a motion to intervene in the case. which was denied. In 1997, she was arrested resulting from an incident involving Laurie J. She was charged with setting Laurie J.'s jacket on fire, while another grandchild was present with Deborah G. in the same home. Although the original charges included risk of injury, they were resolved by convictions for breach of peace and disorderly conduct. DCF, for apparently good reason, did not place Katherine with CT Page 8854 her.
In November, 1998, Sean D. applied to a program that supplies gifts to the children of incarcerated parents. Sean D. has sent three gifts to Katherine through DCF. There is no evidence in the record to establish that any was presented in advance of the filing of the termination petition.
At trial, Sean D. presented evidence that, while in prison, he had completed a ten week program on behavior management, which is similar to an anger management course, and an eight week program on sexual victimization. He has also received individual counseling in prison.
He has called DCF to express his concern about Katherine. There is no evidence that he made regular calls prior to acknowledging paternity. He has also sent letters to DCF about Katherine. Five letters were presented as exhibits. Exh. AA. None was dated before April 16, 1999. The most recent was dated January 1, 2000.
He also claims that he has not been offered services by DCF through correctional authorities. There is no evidence in the record to the contrary.
D. The Children and Their Progress In Foster Care
1. Michael
Michael was placed with Jill H., a licensed foster mother, when he was two weeks old, in May, 1997. He had been born testing positive for drugs in his system. Jill H. has had twelve foster children in her care at various times since she became licensed in March, 1996. At the time of trial, two other children who also are siblings of each other were living in her home; their parents' rights have been terminated and she and her husband were in the process of adopting them. Her husband, Paul H., the foster father, was convicted in October, 1998 of driving under the influence. DCF required him to attend an alcohol education program at the McCall Foundation.[5]
Jill H. described Michael as a very emotional, nervous child. He is a very kind, talkative, loving little boy. Michael is bonded to his foster parents and to the other children living in his foster home. Jill H. expressed her and her husband's willingness to adopt Michael and Katherine.
2. Katherine
CT Page 8855
Katherine was placed with Jill H. and Paul H. in August, 1998 when she was three weeks old. She, too, is a very talkative child. She has a very good relationship with her brother, Michael. They are playful and affectionate with one another. Both Michael and Katherine are also bonded to the two sisters for whom Jill H. also serves as a foster mother.
Katherine refers to Jill H. and her husband as her mother and father. Unfortunately, Jill H. has begun to call Katherine "Hayley," under the assumption that she will be permitted to adopt Katherine and that her name will be changed. Ms. Tardif, the assigned DCF social worker, acknowledged that she was aware of this practice, which apparently was condoned.
E. Efforts At Reunification and Rehabilitation
1. Michael W.
Visitation
During the first year of Michael's life, after April 21, 1997, his date of birth, Michael W. visited him twelve to fourteen times. Except for an initial visit at a hospital after his birth, visits did not begin until after paternity was established in September, 1997. Thereafter, Michael W. visited his son at DCF until visits were moved to the foster home in early 1998. During his second year of life, his father visited Michael approximately six times. He had been offered supervised visitation on an every other week basis, but only availed himself of the opportunity on a very limited basis. Visits could have occurred, for example, every other week at the foster home beginning in early 1998 and until late in that year. He did not fully take advantage of this opportunity. According to his own estimate for 1998, his visits only totaled "eleven or twelve minimum." Trial Transcript ("Tr."), May 4, 2000, at 116. Even if the total amount in 1998 had been fifteen, it would represent a paucity of visits to a very young child by a father who then could have visited much more often. As a result, no meaningful relationship was established with his son. To have successful reunification, most parents show a day-to-day interest in their children, participate in doctor appointments, and move on to an increase in the frequency of and duration of visits, as well as unsupervised visits. Michael W.'s interest was insufficient to follow this type of progressive path.
After a hospital visit in May, 1997, approximately seven others occurred in 1997. Visits went poorly. The father had difficulty interacting with his son. During 1997, Jill H. received no phone calls or letters from Michael W. CT Page 8856
In February, 1998, at Jill H.'s suggestion, visits began to be held at her home. She received twelve phone calls seeking visits from Michael W. or his mother in 1998. Michael W.'s mother attended four visits. Michael W. claimed that problems with the frequency of visitation began in the summer of 1998. Although he contended he was then denied requested visits by Jill H., he neither contacted his attorney or DCF to complain.
Visits at the foster home lasted about one or two hours. There was little interaction between father and son. The child resisted interaction with his father. Michael W. spent about twenty-five per cent of each visit with Michael; he spent the rest of the time speaking with Jill H. and her husband. According to Michael W.'s testimony, he had decided to consent to the termination of his rights in January, 1998. Michael W. and his mother, Betty W., both discussed with Jill H. the issue of Michael W.'s offering to consent to the termination of his parental rights, beginning in February, 1998. Betty W. asked Jill H. to discuss it with Michael W. since she did not want to bring up another child herself. At trial, Betty W. acknowledged twice raising the subject of adoption of Michael with Jill H. and said she would always regret it. Now, she believes her son is ready to care for Michael, and she testified in his support.
Unfortunately, Jill H. took it upon herself discuss with Michael W. the termination of his rights, commenting on what she felt was best for Michael's emotional well-being and his attachment to his foster parents. Prior to April, 1998, Michael W. informed her that he would consent to termination. Michael W. had been led to believe that if he consented to termination, Jill H. would let him remain a part of Michael's life. At trial, Michael W. stated that he felt Jill H. "hounded" him about this, but, again, he did not complain to his attorney or to DCF.
Michael W.'s and Jill H.'s relationship began to deteriorate in the fall of 1998. At that point. Jill H. and her family were planning to move to another town. Ms. Tardif, the DCF social worker assigned to the case, had not been able to reach Michael W. She decided that, in order to make Michael W. contact Ms. Tardif, Jill H. should not give him her new phone number until he did so. Also, since they were moving, Jill H. declined Michael W.'s request for a visit in December, 1998. Around the same time, she was in an automobile accident and suffered a concussion.
When visits stopped in Jill H.'s home, Michael W. thought he "was being shafted." Tr., May 4, 2000, at 88. He commented, "she made a promise that I'd be a part of Michael's life if I consented. All of a sudden the visits stopped at her home." Id.
In January, 1999, Michael W. changed his mind about consenting. He had CT Page 8857 gotten a better job and he and his mother and sister were planning to buy a house. Michael W. felt he was now able to take care of Michael. He finally contacted DCF on January 11, 1999. He also informed Jill H. of his change of heart.
Since Jill H. wanted Michael and the other two girls living in her home to become familiar with their new surroundings, she decided not to have visits at their new home right away, although she did provide her phone number to Michael W. Michael W. acknowledged that he lost this number twice. When Jill H. felt that Michael W. had become hostile to her she decided to continue not having visits at her home.
Visits were subsequently scheduled at the DCF office. As noted, the termination petitions were filed on January 22, 1999. Michael W. was permitted to visit every four to six weeks.
From the filing of the petition seeking termination in January, 1999, through the first day of trial on January 19, 2000, six visits were scheduled, but only five were held since Michael refused to come to one visit in July, 1999. Prior to the adjudicatory date of May 6, 1999, only one visit occurred in 1999, in February. According to Michael W., Jill H. stated she would no longer transport Michael to visits in February, 1999. Tr., May 4, 2000. at 111. In April, 1999, a discussion of visitation issues occurred. Tr., March 28, 2000, at 44. Jill H.'s unwillingness to transport Michael was reviewed. She continued to transport Michael to visits afterwards. Tr., January 19, 2000, at 55.
Since Ms. Tardif received the case in September, 1998, Michael W. has attended every scheduled visit with Michael. During the time visits were occurring at Jill H.'s home, except for one occasion, he did not seek to visit on a week-day, such as in the evening, since he was working full-time.[6]
Parenting Counseling
Michael W. first sought parenting classes in February, 1999, after the termination petition was filed. Ms. Tardif referred him to North Central Counseling and Support Connections. Although that agency was not offering parenting classes, it offered individual counseling, which was declined. Tr., March 28, 2000, at 42. In October or November, 1999, he finished a parenting class offered by another service provider.
Contact With DCF
In January, 1998, Michael W. told the then-assigned DCF social worker that he believed it was in Michael's best interest to be adopted and that CT Page 8858 he would terminate his parental rights. Children's Exh. 2, Ongoing Individual Treatment Plan, dated April 23, 1998, at 2 of 9. In view of his plan, no reunification services were being offered to him. Id. at 3 of 9. As of this report, Michael W. had not supplied DCF with information about his previous medical condition, Histicytosis X. Id. at 4 of 9. Michael W. characterized this childhood condition as "life threatening." Tr., May 4, 2000, at 105. There is no record that any medical information about it was ever provided by Michael W. At trial, Michael W. testified that he could not recall whether he provided it or not. Id. at 106. Finally, the report noted that a termination petition would be filed. Exh. 2 at 8 of 9. Copies of this Treatment Plan were sent to Michael W. and to his attorney in May, 1998. Children's Exhs. 3 and 4. Michael W. did not challenge this plan.
Initially, Michael W. did not attend administrative case reviews where DCF's plans for Michael were discussed. He was informed by a DCF social worker that it was not necessary for him to take time off from work to attend administrative case reviews concerning Michael. He explained that since he had been told his attendance was not necessary, he did not attend. After the termination petition was filed, he began to attend.
Ms. Tardif received the case in September, 1998. Thereafter, she was unsuccessful in reaching Michael W. by telephone. After he did not attend an administrative case review in November, 1998, she sent him a letter, with a copy of the current Treatment Plan, which reiterated DCF's intention to seek termination of Michael W.'s rights, asking him to contact her. Children's Exh. 1. At that point, she advised Jill H. not to have any more visits at her home until Michael W. contacted DCF. She also asked her to ask Michael W. to contact her in order to schedule a visit and to discuss his plans. He finally contacted her on January 11, 1999, more than five weeks later. Subsequently, he called her only to schedule visits.
In February, 2000, Michael had a seizure and was taken to a hospital, and then was monitored by a pediatrician. Michael W. was advised of this at a visit. Although he called Ms. Tardif to inquire of Michael's condition, he could not recall what she said about it.[7]
Other Expectations
As to Michael W., DCF had no substance abuse issues. He did not become involved with the criminal justice system. He maintained adequate housing and income.
2. Sean D.
CT Page 8859
Sean D.'s attorney requested a visit for him with Katherine at a court appearance on August 27, 1998. Although he refused to acknowledge paternity of Katherine until January, 1999, Sean D. did ask Ms. Tardif for a visit in October or in November of 1998 and did ask for photographs of Katherine. Since paternity was in question at that juncture, visits were not permitted.
A first visit occurred in April, 1999, at his place of incarceration. This was the first time Katherine had seen him. Ms. Tardif and Jill H. were present also. Katherine became very upset. Jill H. held Katherine most of the time.
On the two subsequent occasions visits were held, June 3 and August 2, 1999. Jill H. did not attend. Since Katherine knew Ms. Tardif, who she had seen once per month in home visits, Ms. Tardif took Katherine to the visits. Since Sean D. was in a maximum security facility, nothing could be brought in with which to occupy Katherine, such as toys.
Katherine was very upset throughout each of these visits. Neither Ms. Tardif nor Sean D. could calm her or get her to stop crying. After the third visit between Katherine and Sean D., Jill H. recommended that visits cease. Katherine was very upset by them and had to be held most of the rest of the day. Visits had had to be ended early due to her emotional reaction. Sean D. asked for increased visitation, but visits were terminated in September, 1999. Although DCF's policy manual requires discussion with parents prior to any change in visitation, Exh. BB, Section 36-75-1, DCF did not comply with this directive in Sean D.'s case. He was informed of the decision to end the visits after it had been made.
While Sean D. showed interest in Katherine after he acknowledged paternity and after the filing of the termination petition, in January, 1999, his pre-petition involvement was limited to (1) suggesting his mother as a caretaker; (2) asking for a visit and photographs in the fall of 1998; and (3) applying to a program for the provision of a gift or gifts.
F. Evaluations by Dr. Meier
Robert D. Meier, Ph.D., a clinical psychologist, conducted psychological evaluations of Michael W. and Sean D. In addition, he observed their children interact with them. He also reported concerning Michael and Katherine, based on interviews with Jill H. He prepared a report of these evaluations, dated December 8, 1999. Exh. 3.
1. Michael W.
CT Page 8860
Michael W. expressed to Dr. Meier allegations about DCF's and Michael's foster family's interference with his bond with Michael. While he was encouraged to visit, he claimed he felt he could not refer to himself as Michael's father when Jill H. was present and that his mother had been discouraged from visiting and from referring to herself as Michael's grandmother. He complained of Jill H.'s continual admonitions that it was in Michael's best interest to stay with her. Id. at 3. Dr. Meier noted that foster parents should not negotiate termination issues, such as in Michael W.'s situation, by proposing he could still be involved in Michael's life post-termination.
The psychological profile presented by Michael W. was found to be valid, with some limitations due to his level of defensiveness and tendency to deny problems. Dr. Meier concluded:
 Those with this profile tend to be excessively sensitive and overly responsive to the opinions of others. They feel that they are getting a raw deal from life, and tend to rationalize and blame others for their own problems. There is generally a high level of suspiciousness, and such individuals may exhibit hostility and resentment. Generally, there is a suspiciousness of the motives of others.
Id. at 8. To Dr. Meier, Michael W.'s overly defensive attitude raised serious questions, including questions about his insight.
He had little understanding or knowledge of what his son was doing. He also showed a lack of emotional intensity concerning his child. Dr. Meier did not see a strong commitment to or emotional involvement with Michael on Michael W.'s behalf. This view was based, in part. on the amount of visitation which had occurred. of note also was the fact that Michael W. did not mention to Dr. Meier the prospect of receiving support from his own mother in his effort to care for Michael.
Also significant to Dr. Meier was Michael W.'s mild response to what he claimed were DCF's and Jill H.'s impingements on his relationship with Michael. Although there was nothing in his psychological profile to prevent him from seeking intervention if he had felt undermined by Jill H., he did not show an intense reaction, which was further evidence of a lack of commitment. Instead, he used avoidance and denial. In Dr. Meier's view, Michael W. was rationalizing about what had occurred concerning his child. His lack of reliability, inconsistency, and lack of an emotional bond with Michael W. were critical. CT Page 8861
2. Sean D.
As to Sean D., Dr. Meier concluded that the personality profile he presented was validated. He summarized as follows:
 Those with this pattern are generally characterized as having disregard for social standards and value. They frequently get into trouble because of antisocial behavior, fighting, substance abuse, and problems in relationships are common. Such individuals tend to be self-centered and self-indulgent. They are likely to be impulsive and unable to delay gratification. There is an unwillingness to accept responsibility for their own behavior, and a low tolerance for frustration. Such people are usually restless and overactive, and may create a favorable first impression. However, relationships are likely to be superficial and they seem incapable of deep or lasting emotional ties. It is generally true that beneath a facade of self-confidence, such people are immature, insecure and dependent on others. They often try to deny such feelings, however. There are also some indications that Mr. [D.] may also have difficulty with his thought process, sometimes having problems concentrating, focusing his thoughts, and reasoning effectively.
Exh. 3 at 9.
Dr. Meier also found Sean D. to have limited insight into his problems. While he acknowledged having engaged in substance abuse, he denied the serious impact it had had on his life. Id. at 13. The prognosis for meaningful change was quite poor. His lack of insight is consistent with his profile. He has demonstrated a pattern of anti-social behavior as evidenced by his convictions for serious crimes. This pattern of behavior "has led to a long prison sentence which, unless modified, would not permit him to play a significant role in his daugther's life, even if he were to rehabilitate at a later time." Id. at 11.
3. Michael
Dr. Meier's evaluation of Michael was based on an interview of Jill H. and his observation of interactions. He found Michael "to be doing very well, is progressing in all areas, and demonstrates only minor emotional or behavioral problems for a child at this age." Id. at 7. CT Page 8862
Michael was observed with his father, Michael W. He would not remain alone with Michael W. and Dr. Meier; Jill H. had to remain in the room for about one-half of the session, until Michael became more comfortable. Id. at 9.
Michael calls Jill H. "mommy" and his foster father "daddy." Id. at 10. While he recognized Michael W., he "did not relate to him as a parent figure." Id. at 10. Eventually, Michael interacted with Michael W. and conversed with him. He "was aware of his father as someone with whom he visits. There was not parent/child bond, but the interaction seemed comfortable for the child." Id. at 10.
In Dr. Meier's view, the amount of time Michael W. spent with his child was not sufficient to create a parent-child relationship. As an excuse, Michael W. stated to Dr. Meier that he had had to work. He placed other things before visiting.
While Michael W. asserted as a complaint that Jill H. stated she would not bring Michael to visits, Dr. Meier noted that it is common for foster parents not to be involved in visiting. Here, the foster mother had allowed visits to occur at her home. If a parent is unhappy with the visits, often they are moved to a neutral site.
4. Katherine
Similarly, Dr. Meier's evaluation of Katherine was based on his interview with Jill H. Developmentally, Katherine was found to be "on target in all areas." Id. at 8. She was found to be "closely bonded" to Jill H. Id.
Sean D. was observed with Katherine. She did not recognize him and Jill H. was asked to remain for the interaction since Katherine would not separate from her. Id. at 10. She cried when Sean D. tried to pick her up. This was unsurprising since he has seen her only three times, the last being several months earlier. Katherine would not go to Sean D. Her crying was consistent with her reaction at visits, as discussed above.
5. Dr. Meier's Conclusions
Clearly, the foster parents are viewed by Michael as his psychological parents. Id. at 11. While Katherine was too young to have a psychological parent, Dr. Meier concluded that she sees Jill H. as her primary caretaker. When the children seek comfort, they look to Jill H. They have lived with their foster parents for virtually their entire lives.
In summary, Dr. Meier concluded: CT Page 8863
 It does not appear that either father would be able to provide a suitable home for their child in the foreseeable future. Although Mr. [W.] claims to have an interest at this time, and admittedly changed his mind about agreeing to termination of his rights, there are serious questions as to the degree of effort he exhibited to reunify with his child over the past two years. There would also be serious concerns about separating the children at this time since they have developed a bond with each other as well as with the foster parents.
Id. at 12. He added his recommendation:
 Given the length of time that the children have been in placement, and given the fact that they view at least the foster mother as the psychological parent, permanency in the near future is important for these children. They have been in a temporary situation well beyond the recommended period of time. Unless Mr. [W.] was prevented from reunification, which does not appear to be the case, a plan for permanency for the children should be considered as soon as possible.
Id. With regard to guidelines on the amount of time a child should spend in temporary care, he noted that they are based on the effects on children. If a child is placed before the age of one year, permanency is needed within one year. For most children placed after that, permanency should be accomplished within one to two years. After the first year of life, the next one to two years are critical for bonding. A child's independence and sense of well-being is affected. For example, the fact that a child expects to see his parent in a short time helps him develop trust. He believes his expectations will be met. This has a strong implication for the development of personality.
If Katherine were removed from Jill H.'s care, it would be traumatic for her and would very likely cause emotional distress and adjustment problems. The trauma could be severe enough to have effect on her later in life.
Dr. Meier noted that (at the time of his trial testimony) Michael had been in temporary care almost three years, making permanency important. Now, after such a lengthy period, the effect on Michael of removal from his foster parents must be viewed as significant. At this critical time in his development, he is developing trust and internalizing rules. If he CT Page 8864 were removed from his foster family, he would not be able to understand why, and would become angry and mistrustful. Separation would be traumatic, causing a moderate to serious impact on him. Counseling would be needed to assist him in adjusting. Thus, it would be difficult for Michael to be placed with his father. He stated that "it's also difficult to predict with any accuracy what long-term effects it may have on the child." Tr., April 25, 2000, at 45. If the issues Dr. Meier identified were addressed, he could be re-introduced to him.
In his own trial testimony about Michael's best interests, Michael W.'s remarks showed the lack of understanding of his son which Dr. Meier observed. When asked what had changed for Michael from the time when Michael W. had decided to consent to termination in January, 1998, he responded:
 The first thing was the ill-tempered foster mother. Every time I see her, she goes off on me basically.
Tr., May 4, 2000, at 95. He acknowledged that he had never seen Jill H. ill-tempered with Michael or to have treated Michael in an inappropriate manner. When asked "what other changes have there been in Michael's best interest?" he responded that he could not think of anything else "right now." Id. Michael W.'s responses were focused on his own deteriorated relationship with Michael's foster mother, not on Michael and what was best for him.
ADJUDICATION
A. Neglect Petition
Conn. Gen. Stat. § 46b-120 (8) provides that a child may be found "neglected" who "is being denied proper care and attention, physically, educationally, emotionally, or morally or . . . is being permitted live under conditions, circumstances or associations injurious to his well-being . . ." Conn. Gen. Stat. § 46b-129 (j) governs the adjudication of neglect petitions. In re David L., 54 Conn. App. 185, 191
(1999).
In the neglect petition, the petitioner alleged that Katherine was neglected, in that she was being denied proper care and attention and that she was being permitted to live under conditions, circumstances or associations which were injurious to her well-being. As noted, at the time, Laurie J. had left Katherine in the care of a person whose name and address she did not know. Sean D. was incarcerated. Pursuant to Conn. Gen. Stat. § 46b-129, by a fair preponderance of the evidence, the court finds that Katherine was neglected. CT Page 8865
B. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110
[dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The word "reasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) In re Amber B.,56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122
(1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts means doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re Amanda A., 58 Conn. App. 451, 455
(2000).
In accordance with § 17a-112 (c)(1), DCF may meet its burden concerning reunification in one of three ways: (1) by showing that it made such reasonable efforts; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) if the court previously determined that such efforts were not appropriate. As to Sean D., by clear and convincing evidence, DCF has established (2). As to Michael W., by clear and convincing evidence, it has established (1), (2), and (3). If view of her consents, no findings need be made as to Laurie J.
1. Sean D.
Sean D. was both unable and unwilling to benefit from reunification efforts. He has been incarcerated for Katherine's entire life. DCF could not provide reunification services to him, due to his incarceration. Inre Michael B., 1994 Ct. Sup. 5818-B (June 22, 1994) (Foley, J.). Moreover, he refused to acknowledge paternity until January 12, 1999, ten days before the filing of the termination petition, and more than five months after his daughter was born. DCF could not provide reunification services to a respondent who denied paternity. In re Dalilah Rose N.,1996 Ct. Sup. 6820, 6831 (December 16, 1996) (Foley, J.), affirmed, CT Page 886648 Conn. App. 921 (1998); In re Hope W., 1990 Ct. Sup. 3749, 3759
(November 26, 1990) (Brenneman, J.). After he acknowledged paternity. DCF facilitated the scheduling of visits at the prison, until it became obvious that Katherine was so upset by them that they had to be discontinued. As the record reflects, even after he admitted paternity on the eve of the termination petition's filing, he remained incarcerated. Clearly, he was unable, as a result of his voluntarily undertaken felonious acts, to be reunified with Katherine.
2. Michael W.
DCF made reasonable efforts to reunify Michael W. with Michael. He was unable or unwilling to benefit from these efforts. Michael W. was provided with the opportunity to visit Michael, first at DCF, then at the foster home. After his paternity was established in September, 1997 he began to visit. He never visited frequently enough to establish a significant relationship with Michael. As a result of his statement to DCF that he planned to consent to the termination of his rights, DCF did not offer him services until after he changed his mind.
On the eve of the filing of the termination petition, after he had long been aware of the permanency plan for Michael, and after the court's September, 1998 determination that reunification efforts as to him were no longer appropriate, he chose to contest the petition in January, 1999. At That point, he asked Ms. Tardif what else he could do and was referred for parenting classes. One year and three months had elapsed since the entry of the court-ordered Expectations, which required parenting counseling. As a result of his long delay, he did not complete such classes until the fall of 1999, well after the May 6, 1999 adjudicatory date and close to the commencement of trial. Clearly, this effort was too little and too late.
The court credits Dr. Meier's view that Michael W. was not really committed to Michael. If he had been, he would have pursued reunification. Instead of being unavailable to Michael, he should have been visiting regularly and progressing to more and unsupervised visits. If the visits at the foster home were somehow unsatisfactory or too infrequent for him, he could have challenged them early in the process.
Thus, the court is unpersuaded that DCF or Jill H. thwarted Michael W.'s relationship with Michael. He was represented by an attorney throughout these proceedings. If the plans for Michael were unacceptable or if he truly believed Jill H. was over-bearing, there were avenues available by which to pursue relief, through DCF's administrative process and through the court. The court agrees with Dr. Meier that foster parents, such as Jill H., should not attempt to negotiate termination CT Page 8867 issues with parents. That that occurred here is unfortunate. Nevertheless, the evidence is clear and convincing that Michael W. was provided with a reasonable opportunity, over many months, to be reunified with his son.
Reunification must be a joint effort to be successful. Michael W. did not actively engage in the process when the opportunity for reunification was there for him. Instead, after-the-fact, he chose to criticize the process. Unfortunately, such behavior is consistent with Dr. Meier's findings as to his psychological profile.
The statutory duty to make reasonable efforts to reunify does not oblige DCF to accomplish a successful result. In re Natalia G.,54 Conn. App. 800, 803 (1999). Efforts at reunification require a constructive response from the parent if they are to be meaningful. In reSavanna M., 55 Conn. App. 807, 813 (1999). Here, either due to his unwillingness or inability to diligently work towards reunification, Michael W. did not so respond.
Clearly and convincingly, DCF has established that, under these circumstances, it made reasonable efforts to reunify this parent with his child and that the parent was unable or unwilling to benefit from those efforts. Moreover, the evidence is also clear and convincing that the court's earlier determination, in September, 1998, that reunification efforts as to him were no longer appropriate, was clearly correct, amply supported, and should not be disturbed. At that point, Michael W. had done very little towards reunification with Michael and had hardly seen him. At that juncture, Michael had been in foster care for over one year and four months, since the age of two weeks. Without question, DCF has satisfied its burden of proof as to reunification.
C. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998), cert. denied, 247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF has alleged the grounds of abandonment as to Sean D. and Michael W. and failure to rehabilitate as to Michael W. The court finds that DCF has proven each of these grounds by clear and convincing evidence. Again, as to Laurie J., in view of her consents, no findings need be made as to the petition's allegations concerning her.
1. Abandonment
CT Page 8868
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted) In re Roshawn R.,51 Conn. App. 44, 52 (1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re MigdaliaM., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
More than a merely sporadic showing of interest, concern or responsibility for the child is required by the statute. In re AngellicaW., 49 Conn. App. 541, 551 (1998). The test is not limited to whether a parent has shown some minimal interest in the child. In re Juvenile Anpeal(Docket No. 9489), 183 Conn. 11, 14-15 (1981); In re Rayna M.,13 Conn. App. 23, 36 (1987). Statutory abandonment, as opposed to common law abandonment, does not require proof of an intention to abandon totally or permanently. In re Shannon S., 41 Conn. Sup. 145, 151 (1989), aff'd per curiam, 19 Conn. App. 20 (1989). Moreover, parental "interest" in the child is not the criterion for the determination as to whether abandonment has occurred; rather, the statute requires interest, concern and responsibility "as to the welfare of the child." In re Rayna M.,supra, 13 Conn. App. 36-37. CT Page 8869
The court is mindful that incarceration does not constitute abandonment. In re Michael M., 29 Conn. App. 112, 120 (1990). However, "it is also not a shield against a finding of abandonment." In reDanual, 1997 Ct. Sup. 4239, 4249 (April 2, 1997) (Brenneman, J.). The restrictions of incarceration "do not excuse a failure to make use of available though limited resources for contact with a distant child." Inre Juvenile Appeal (Docket No. 10155), supra, 187 Conn. 443.
As the court noted in In The Interest of Shantrise B.,1998 Ct. Sup. 11531, 11536 (October 15, 1998) (Schuman, J.), "[a] father's obligation to maintain contact with his children is not suspended during the pendency of a paternity test, especially when, as here, the father has a strong reason to believe that he is in fact the father." "In dealing with infant children, a critical element in evaluating the father's interest is the timing of his actions and his good faith actions in respect to the child." In The Interest of Courtney H., 1998 Ct. Sup. 7685, 7693 (June 22, 1998) (Foley, J.). "Promptness is measured in terms of the baby's life, not by the onset of the father's awareness." (Internal quotations an citation omitted.) Id. at 7693-94. Clearly, "the need for both immediate child-care and prompt decision-making is of greatest urgency when it comes to the issue of newborn infants." Id. at 7694. This need "comports . . . with each child's biological and psychological need for unthreatened and unbroken continuity of care. . . ." Id. (quoting Goldstein, Medical Care for the Child at Risk: On State Supervision of Parental Autonomy, 86 Yale L.J. 645, 649 (1977), cited in In re JuvenileAppeal, (83-CD), 189 Conn. 276, 286 n. 11 (1983)). Accordingly, a father "is required to act expeditiously and in good faith to perfect his paternal rights." In The Interest of Courtney H., supra,1998 Ct. Sup. 7695.
(1) Sean D.
Volitional acts by Sean D. prior to Katherine's birth led to the long term of imprisonment which he is currently serving. These acts are not germaine, however, to the question of abandonment. Post-birth conduct alone must be considered by the court in rendering an adjudication. In reValerie D., 223 Conn. 492, 505 (1992).
Instead of acting expeditiously immediately after her birth to provide interest, concern, and responsibility for Katherine's welfare since he had good reason to believe he was her father, Sean D. refused to admit to paternity until the eve of the filing of the termination petition, five-and-a-half months later. While he had asked for photographs and to visit with her before admitting paternity, he apparently did so to ascertain whether he really was her father, not out of continued concern CT Page 8870 for her well-being. After all, his only other pre-petition efforts on her behalf were proposing his mother as a caretaker and applying to a gift program. At the time, his mother faced criminal charges related to Laurie J., Katherine's mother. Ironically, and sadly, these, too, involved setting fire to Katherine's mother's property.
Then, after the petition was filed, he sent some letters to DCF and began making regular phone calls to DCF. He continued to seek visitation as well. He also sent three gifts.
Viewed in totality, Sean D.'s conduct toward Katherine constitutes abandonment. For five-and-a-half months, during the critical period after her birth, Sean D. effectively did almost nothing for Katherine. That is a sufficient time period, given her infancy, to prove abandonment. In TheInterest of Shane P., 1998 Ct. Sup. 1210, 1216 (February 2, 1999) (Schuman, J.), affirmed, 58 Conn. App. 244 (2000); In re Jamaul R.,1992 Ct. Sup. 670,676 (January 10, 1992) (Brenneman, J.). Then, subsequent to the petition, he continued to fail to present an appropriate plan for her care. While he demonstrated some belated interest in her, others have had to provide all the care and nurturing she required as a newborn child and afterwards. His communications with DCF inquiring about her, his meaningless visits with her, and his gifts to her are indicia of some interest, but are insufficient to overcome the clear and convincing evidence of statutory abandonment.
(2) Michael W.
As to Michael W., the evidence of abandonment is also clear and convincing. Although he, too, had good reason to believe he was his child's father, he essentially did nothing concerning Michael, except for seeing him once at a hospital, for the five months between Michael's birth on April 21, 1997 and September 23, 1997, when the results of the paternity testing confirmed he was the father.
Since he was not incarcerated, he was free to have regular and frequent visits with his son. He chose not to do so and the number of his visits remained low even after they began in the fall of 1997. He could not even bring himself to provide medical information to those who were caring for his son on a day-to-day basis. He did not offer a meaningful plan for Michael's care. Although he said in the fall of 1997 he would be ready in a year, his conduct demonstrated his lack of genuine concern and responsibility for Michael's welfare.
He or his mother made occasional phone calls to schedule visits and gifts were provided on holidays and birthdays. Belatedly, he expressed renewed interest in caring for Michael on the eve of the filing of the CT Page 8871 termination petition. This followed what he construed as the foster mother's "reneging on their agreement" concerning termination. Michael W.'s Brief, dated July 11, 2000, at 7. He argued that when he believed his relationship with his son was in jeopardy, he asked for Michael's return. Id. To the contrary, the record reflects that Michael W. never spent enough time with Michael to demonstrate the required parental interest, concern or responsibility for him.
His conduct, through the adjudicatory date of May 6, 1999, viewed as a whole, constitutes statutory abandonment. There were long periods, including the critical months after Michael's birth, and during 1998, when his conduct amounted only to sporadic interest. While there was a dispute in the months leading up to the adjudicatory date concerning whether or not Jill H. would bring Michael to visits, this short period does not negate what transpired as to visitation in 1997 and 1998. While Michael W.'s gifts, calls, and occasional visits are indicia of some interest, they paled in the face of the substantial evidence of abandonment.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found Michael to have been neglected, thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989); In re HectorL., 53 Conn. App. 359, 366-67 (1999).
 `Rehabilitate' means `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her CT Page 8872 child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of what which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(internal quotation marks and citations omitted.) In re Eden F.,250 Conn. 674, 706, motion for en banc reargument denied, 251 Conn. 924
(1999).
As the Appellate Court recently noted In re Sarah Ann K.,57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." (internal quotation marks and citation omitted.) At the adjudicatory phase, the question is whether Michael W. was better able to be a parent to Michael as of the adjudicatory date, 6, 1999, than at the time of his commitment. See In re Michael M., 29 Conn. App. 112, 126
(1992). The adjudicatory date was almost one year and seven months after Michael's neglect adjudication on October 9, 1997.
This type of inquiry "require[s] the court to obtain a historical perspective of the respondent's child caring and parenting abilities." Inre Sarah Ann K., supra, 57 Conn. App. 449. Based on the foregoing discussion, the evidence is clear and convincing that Michael W. is not able to assume a responsible position in Michael's life, nor could he become able to do so within a reasonable time.
The foregoing discussion concerning Michael W.'s efforts toward reunification, supra, at 23-25, is relevant here as well and need not be repeated.
The court-ordered Expectations which were issued to and signed by Michael W. and his attorney in October, 1997 were not onerous. Yet, Michael W. failed to comply with them in two key respects. First, as discussed, he did not visit his child on a regular and frequent basis when he could have done so. Second, only belatedly, after the adjudicatory date, did he take parenting classes. In addition, he did not respond promptly to DCF in late 1998. While this bore less significance than his failure to visit and his failure to learn parenting skills, it is further evidence of his lack of commitment.
In a case of this type, the court may reasonably rely on the evaluation CT Page 8873 of an expert witness. In re Eden F., supra, 250 Conn. 706-707. Michael W.'s lack of parenting skills and desultory visitation history prevented him from establishing a relationship with Michael. As noted, Dr. Meier evaluated Michael W. and observed his interaction with Michael. The court credits his view that, although Michael had been in foster care for approximately two-and-a-half years when Dr. Meier's evaluation occurred in November, 1999, there was no significant relationship between Michael and his father. Initially, Michael would not remain alone with his father and the evaluator. He saw his father only as someone with whom he visited. He was not bonded to his father. His father did not spend enough time with Michael and did not have the skills to establish a relationship with him beyond that of occasional visitor.
In this type of inquiry, § 17a-112 (c)(3)(B) requires the court to focus on the "needs of the particular child." While Michael W. was making insufficient progress toward rehabilitation. Michael's needs had to be met by others. The record reflects that he is bonded to his foster family, considers his foster parents to be his mother and father, and is bonded to his sister. Apparently, he is sufficiently well-adjusted to participate in visits with Michael W., but there is no indication that he views him other than as someone who visits him, as opposed to someone who has or could assume a responsible role in his life. At this point, Michael remains an emotional, nervous child. Dr. Meier found that he was doing well in foster care. As a result of Michael W.'s conduct, lack of interpersonal skills, and lack of insight into his son, Michael hardly knows his father and his father does not really know him.
The past must be seen as a basis for prediction of the future. In view of his demonstrated lack of commitment to Michael, there is no basis on which to believe that Michael W. had been rehabilitated, either when the termination petition was filed or by the adjudicatory date. When he knew his relationship with his son was at stake, he did little to establish one. His trial testimony corroborated Dr. Meier's observation that he has little insight into his own son. His focus was not on Michael as a person, but on winning the issue, as if the case were somehow a contest between Michael W. and Jill H., which it is not. of course, if somehow he did make a complete turn-around and, over another course of years, showed a steady, increasing commitment, and parenting skills, presumably he could establish a better relationship. Forcing Michael to wait another period of years to find out whether his father would truly become committed to being a parent to him and acquire the skills to do so would constitute placing his needs at risk yet again. There is no reason to believe that Michael W. will be rehabilitated within a reasonable time. He cannot assume a responsible position in Michael's life now, nor could he within the reasonable future. CT Page 8874
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112
(c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the disposition hearing. Practice Book § 33-5.
Because of the deleterious effects of prolonged temporary placement, "time is of the essence" for Michael and Katherine. In re Antony B.,54 Conn. App. 463, 476 (1999); In re Alexander V., 223 Conn. 557, 565
(1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In reDrew R., 47 Conn. App. 124, 131 (1997). Our Supreme Court has noted that "long-term stability is critical to a child's future health and development." (citation omitted) In re Eden F., supra, 250 Conn. 709.
Permanency is critical for both Michael and Katherine. As Dr. Meier noted, both children have been in a temporary situation well beyond the recommended period of time. Their foster parents, to them, are the only parents they have ever known. While Katherine is too young to have a "psychological parent," the record is clear that Michael's foster parents are his psychological parents.
The concept of the "psychological parent" repeatedly has been discussed by Connecticut courts in cases of this type. Soon after its publication in 1979, the Supreme Court cited Goldstein, Freud Solnit's Beyond The Best Interests of The Child ("Beyond") and the authors' "suggestion that child placement should maintain `on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent.'" Seymour v. Seymour,180 Conn. 705, 711 (1980) ("Seymour").
Beyond, at 98, defined a "psychological parent" as "one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs, as well as the child's physical needs," quoted in Temple v. Meyer,208 Conn. 404, 408, n. 3 (1988); see also, In re Tricia A.,1998 Ct. Sup. 2290,2296 (February 27, 1998) (Quinn, J.), affirmed, 55 Conn. App. 111
(1999); In re Four Children, 1997 Ct. Sup. 10217, 10225 (October 10, 1997) (Foley, J.). In In re Romance M., 229 Conn. 345, 356 (1994), the Supreme Court recognized the important distinction between a psychological parent and a "person who visits."
In addition, Beyond notes, at 43, that "to avoid irreparable injury, CT Page 8875 placement, whenever in dispute, must be treated as the emergency that it is for the child." (footnote omitted). The authors, in proposing guidelines for decision-makers, based them "on the belief that children whose placement becomes the subject of controversy should be provided an opportunity to be placed with adults who are or are likely to become their psychological parents." Id. at 31. Change of the caretaking person for infants (defined as birth to approximately eighteen months of age) and toddlers "further affects the course of their emotional development. Their attachments, at these ages, are as throughly upset by separations as they are effectively promoted by the constant, uninterrupted presence and attention of a familiar adult." Id. at 32-33. For young children, under the age of five years, "every disruption of continuity also affects those achievements which are rooted and developed in the intimate interchange with a stable parent figure, who is in the process of becoming the psychological parent. The more recently the achievement has been acquired, the easier it is for the child to lose it." Id. at 33.
Removal of either Katherine or Michael from their foster parents' care would be traumatic to them. In particular, if Katherine were removed the emotional trauma could be severe enough to effect her later in life. Also, the children are bonded to one another and separating them from one another would be contrary to their best interests.
While the trauma done to Michael by such a removal conceivably could be treated by counseling, it is clear that unnecessarily inflicting trauma upon a child is contrary to his best interests. To remove either would punish Michael and Katherine again just for being born to parents who were unable or unwilling to care for them. They already suffered removal from their biological parents when they were too young to understand it. Now, Michael would suffer greatly if an attempt were made to substitute his biological father for his psychological parents. For Katherine, in view of her father's lack of an acceptable plan for her, there is no alternative to consider other than being raised by non-relatives. Fortunately, she has bonded to her foster parents, who have cared for her for virtually her entire life.
In so finding, the court does not endorse Jill H.'s behavior in attempting to negotiate conditions of termination with Michael W. or her presumptuousness in starting to call Katherine "Hayley." Such conduct by a foster mother was inappropriate. Ms. Tardif of DCF was aware of the practice of calling Katherine by a name, not a nickname, which was not hers. This conduct should not have been tolerated.[8]
In this matter, neither DCF nor Jill H. acted without flaw. However, their conduct, as noted, did not thwart Michael W.'s or Sean D.'s efforts. of course, the court also does not endorse the foster father's CT Page 8876 recent driving under the influence conviction. Whether or not the foster family will be permitted to adopt the children, as they have stated they wish to do, is not this court's decision to make.
The evidence is clear and convincing that termination is in the children's best interests. For good reasons, neither has ever been in their respective father's care. Instead, almost since birth, each has been in foster care with Jill H. and Paul H. Fortunately, the children are together in a loving and supportive home. It is the only family setting they have ever known.
Here, the children's mother has consented to the termination of her parental rights and there is no reason to believe that either Michael W. or Sean D. can ever assume meaningful parental roles in their respective children's lives. To deny termination would leave the children in prolonged foster care for no reason. As a result, each could be subjected to further legal proceedings concerning their guardianship when they are older, of which they could become aware, and which could be disruptive to their development. Since each is entitled to permanency and since time is of the essence, termination is in their best interests.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(d). See In re Tabitha P., 39 Conn. App. 353, 362 (1995). A discussion of these factors follows.[9]
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF could not timely provide services to Michael W. or Sean D., except for facilitating visitation, which was timely provided. In view of his refusal to acknowledge paternity and later his plan to consent to termination, services could not be provided to Michael W. until early 1999, when a parenting class referral was made. As to Sean D., in view of his incarceration and refusal to acknowledge paternity, services could not be provided.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunify Michael W. and Michael. Such efforts became futile and inappropriate due to his inability or willingness to benefit CT Page 8877 from them. Similarly, due to his criminal activity and incarceration, no efforts beyond visitation could be made towards reunification as to Sean D.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Based on the foregoing discussion, the court finds that Michael W. failed to comply with key elements of the court-ordered Expectations, the terms of which were described supra at 2. The extent of his compliance is discussed above at 8-14 of most significance, he did not visit Michael a sufficient amount and did not complete parenting classes in a timely manner. DCF complied with its obligations as to him. As to Sean D., the terms of the court's order are stated supra at 3. In view of his incarceration, neither he nor DCF could fully comply. Visitation with Katherine was briefly provided, but could not be continued due to her adverse reaction. Parenting counseling could not be provided. Sean D. was incarcerated, making compliance with the housing/income requirements impossible. He did not acquire an adverse disciplinary record in prison. He availed himself of programs and counseling offered to inmates. There was no evidence that he engaged in substance abuse in prison.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Katherine and Michael are bonded to their foster parents, and to each other. Michael is willing to visit with his father but has no relationship with him other than as someone who visits. His foster parents are his psychological parents. Katherine has no relationship with Sean D. and has become extremely upset by visits. Neither child has any ties to Laurie J.
5) The age of the child.
Michael is just over three years and three months old. Katherine is two years old. Each has lived virtually their entire lives in foster care.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or CT Page 8878 contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that Michael W. has not made reasonable efforts to adjust his circumstances or conditions to make it in Michael's best interest to be placed with him in the foreseeable future. His limited visitation history was addressed above. He was unable or unwilling to demonstrate a real commitment to his son or to adjust his behavior in any significant way to be of aid to his child. As to Sean D., he never presented an acceptable plan for Katherine's care. His communications with DCF and occasional gifts evidenced some interest. His underlying behavioral issues, history of felonious acts, and long-term incarceration make it impossible for Katherine to be in his care in the foreseeable future.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Michael W. nor Sean D. faced unreasonable interference from anyone or from economic circumstances. Their respective circumstances were of their own making.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Michael W. and Katherine J. for termination of parental rights to enter with respect to the mother, Laurie J., and the fathers, Michael W. and Michael D., also known as Sean D. Accordingly, the court hereby grants the petitions to terminate the parental rights of Laurie J., Michael W., and Michael D.
The court further orders that the Commissioner of DCF is appointed statutory parent to the children, Michael W. and Katherine J. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect permanent placement and file the further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT CT Page 8879